COLLINS ET AL. *v.* YOSEMITE PARK & CURRY CO.

No. 870. Argued April 27, 28, 1938.—Decided May 31, 1938.

*Mr. Seibert L. Sefton,* Deputy Attorney General of California, with whom *Mr. U. S. Webb,* Attorney General, was on the brief, for appellants.

*Mr. James S. Moore, Jr.,* with whom *Messrs. Herman Phleger, Maurice E. Harrison,* and *Gregory A. Harrison* were on the brief, for appellee.

*Solicitor General Jackson* filed a memorandum òn behalf of the United States.

MR. JUSTICE REED delivered the opinion of the Court.

Appellee, the Yosemite Park and Curry Co., brought. this suit to enjoin the State Board of Equalization and the State Attorney General from enforcing the "Alcoholic Beverage Control Act" of the State of California,[1] within the limits of Yosemite National Park. Appellee is engaged in operating, within the Park, hotels, camps, and stores, under a contract with the Secretary of the Interior, leasing portions of the Park to appellee for a 20-year term. The contract, expressly intended to implement the Congressional desire to make the Park a resort and playground for the benefit of the public, places upon appellee the duty of furnishing visitors with sundry facilities and accommodations. If it pays dividends in excess of 6% on its investment it must pay to the Secretary of the Interior a sum equal to 25% of the excess during the first ten years, and $22\frac{1}{2}\%$ of any excess over 6% earned during the second ten years. Appellee sells liquors, beer and wine to Park visitors for prices approved by the Secretary of the Interior. In the ordinary course of business, it imports from places outside of California beer, wine, and distilled spirits, which it stores and sells within the Park.

According to the allegations of appellee's bill, appellants (defendants below) assert that the Alcoholic Beverage Control Act applies within the Park and that appellee is obligated to apply for permits for importation and

---

[1] Cal. Stat. 1935, c. 330, as amended, Cal. Stat. 1937, c. 681, 758.

sale; that appellee is subject to provisions of the Act prohibiting the issuance of importer's licenses to persons holding on-sale retail licenses, and vice versa; that appellee must pay fees and taxes imposed by the Act or be subject to penalties. Allegation was made that appellants threaten to seize beverages on or being transported to appellee's premises, demand rendition of reports and keeping of accounts, and threaten to institute civil and criminal proceedings against appellee for violation of the Act. On the other hand, appellee's allegations continue, the Secretary of the Interior, under the contract of lease, has approved prices making no allowance for taxes, and has instructed appellee to apply for no license and to pay no tax under the California Act, and that payment of such license fees or taxes will not be allowed as an operating expense under the contract.

Appellee brought this suit to restrain enforcement of the Alcoholic Beverage Control Act within Yosemite Park, on the theory that the Park is within the exclusive jurisdiction of the United States. The suit being one to restrain the enforcement of a state statute as applied to a specific situation, a three-judge court was convened under § 266 of the Judicial Code, 28 U. S. C. § 380. The case was heard below upon motion to dismiss the complaint. The District Court denied this motion. It granted a temporary injunction, 20 F. Supp. 1009, and later granted the final injunction prayed for by the complaint, restraining appellants (a) from entering upon appellee's premises, examining its records, seizing its beverages, or interfering with its importation and sales of beverage within the Park; (b) from interfering with shipments to appellee from outside the State; (c) from instituting any actions based on alleged violations of the Act with respect to the importation, possession, or sale of liquors; (d) from requiring reports thereon; (e) from enforcing the Act as to transactions within the Park.

· The District Court, after noting that Yosemite National Park consists of Yosemite Valley and considerable surrounding territory, first discussed what it conceived to be the situation in the Valley.[2] It reviewed the history of the land: The United States acquired it in 1848 under the Treaty of Guadalupe Hidalgo,[3] reserved proprietary rights when California became a State in 1850,[4] and on June 30, 1864, gave the Valley to California in trust for public park and recreational purposes.[5]

The District Court held that exclusive jurisdiction over the land was acquired again by the United States by virtue of the joint operation of three statutes: an 1891 California law, ceding to the United States exclusive jurisdiction over such land as might be ceded to it;[6] a 1905 California statute re-ceding the Valley to the United States;[7] and the Act of June 11, 1906, 

---

[2] The discussion applies equally to the Mariposa Big Tree Grove.

[3] 9 Stat. 922.

[4] 9 Stat. 452.

[5] 13 Stat. 325.

[6] "Section 1. The State of California hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land as may have been or may be hereafter ceded or conveyed to the United States, during the time the United States shall be or remain the owner thereof, for all purposes except the administration of the criminal laws of this State and the service of civil process therein." Cal. Stat. 1891, c. 181.

[7] "An act to recede and regrant unto the United States of America, the 'Yosemite Valley,' and the land embracing the 'Mariposa Big Tree Grove.'

"Section 1. The State of California does hereby recede and regrant unto the United States of America, the 'Cleft' or 'Gorge' in the granite peak of the Sierra Nevada mountains, situated in the county of Mariposa, State of California, and the headwaters of the Merced river, and known as the Yosemite Valley, with its branches or spurs, granted unto the State of California in trust for public use, resort and recreation by the act of congress entitled 'An act authorizing a grant to the State of California of the Yosemite Valley and of the land embracing the 'Mariposa Big Tree Grove,' approved June 30th, 1864; and

whereby Congress accepted the regrant and constituted the Valley a part of the Yosemite National Park.[8] It further held, over appellants' objection, that there was no constitutional obstacle to the acquisition by the United States of exclusive jurisdiction over land ceded to it for national park purposes. Jurisdiction over the

the State of California does hereby relinquish unto the United States of America and resign the trusts created and granted by the said act of congress.

.    .    ,    .    .    . .

"Sec. 3. This act shall take effect from and after acceptance by the United States of America of the recessions and regrants herein made, thereby forever releasing the State of California from further cost of maintaining the said premises, the same to be held for all time by the United States of America for public use, resort and recreation, and imposing on the United States of America the cost of maintaining the same as a national park. *Provided, however,* that the recession and regrant hereby made shall not affect vested rights and interests of third persons." Cal. Stat. 1905, c. 60.

[8] *"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the recession and regranting unto the United States by the State of California of the cleft or gorge in the granite peak of the Sierra Nevada Mountains, situated in the county of Mariposa, State of California, and the head-waters of the Merced River, and known as the Yosemite Valley, with its branches or spurs, granted unto the State of California in trust for public use, resort, and recreation by the Act of Congress entitled 'An Act authorizing a grant to the State of California of the Yosemite Valley and of the land embracing the Mariposa Big Tree Grove,' approved June thirtieth, eighteen hundred and sixty-four (Thirteenth Statutes, page three hundred and twenty-five), as well as the tracts embracing what is known as the 'Mariposa Big Tree Grove,' likewise granted unto the State of California by the aforesaid Act of Congress, is hereby ratified and accepted, and the tracts of lands embracing the Yosemite Valley and the Mariposa Big Tree Grove, as described in the Act of Congress approved June thirtieth, eighteen hundred and sixty-four, together with that part of fractional sections five and six, township five south, range twenty-two east, Mount Diablo meridian, California, lying south of the South Fork of Merced River and almost wholly between the Mariposa Big Tree Grove and the present south boundary of the Yosemite National Park, be, and the same are hereby,

rest of the Park, it concluded, was in the State until April 15, 1919, when it was offered to the National Government (which had always retained the proprietary interest) in a statute saving to the State, inter alia, "the right to tax persons and corporations, their franchises and property on the lands included in said parks."[9] Ju-

reserved and withdrawn from settlement, occupancy, or sale under the laws of the United States and set apart as reserved forest lands, subject to all the limitations, conditions, and provisions of the Act of Congress approved October first, eighteen hundred and ninety, entitled 'An Act to set apart certain tracts of land in the State of California as forest reservations,' as well as the limitations, conditions, and provisions of the Act of Congress approved February seventh, nineteen hundred and five, entitled 'An Act to exclude from the Yosemite National Park, California, certain lands therein described, and to attach and include the said lands in the Sierra Forest Reserve,' and shall hereafter form a part of the Yosemite National Park." 34 Stat. 831.

[9] "An Act to cede to the United States exclusive jurisdiction over Yosemite national park, Sequoia national park, and General Grant national park in the State of California.

"Section 1. Exclusive jurisdiction shall be and the same is hereby ceded to the United States over and within all of the territory which is now or may hereafter be included in those several tracts of land in the State of California set aside and dedicated for park purposes by the United States as 'Yosemite national park,' 'Sequoia national park,' and 'General Grant national park' respectively; saving, however, to the State of California the right to serve civil or criminal process within the limits of the aforesaid parks in suits or prosecutions for or on account of rights acquired, obligations incurred or crimes committed in said state outside of said parks; and saving further, to the said state the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks; and saving also to the persons residing in any of said parks now or hereafter the right to vote at all elections held within the county or counties in which said parks are situate; provided, however, that jurisdiction shall not vest until the United States through the proper officer notifies the State of California that they assume police jurisdiction over said parks." Cal. Stat. 1919, c. 51.

risdiction of the Park was assumed by the United States by Act of June 2, 1920, which referred to the state act, including its reservation of a power to tax.[10] The District Court held this reservation inapplicable, on the ground that the Alcoholic Beverage Act is chiefly regulatory in nature rather than a revenue measure. Concluding that the United States had exclusive jurisdiction over the land in question, the District Court enjoined the enforcement of the state Act.

From this final decree of injunction, a direct appeal to this Court was taken under §§ 238 and 266 of the Judicial Code. Several questions were argued on the appeal. At this point, reference may be confined to appellants' contention that the United States has no

---

[10] 41 Stat. 731, 16 U. S. C. § 57.

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the provisions of the act of the Legislature of the State of California (approved April 15, 1919), ceding to the United States exclusive jurisdiction over the territory embraced and included within the Yosemite National Park, Sequoia National Park, and General Grant National Park, respectively, are hereby accepted and sole and exclusive jurisdiction is hereby assumed by the United States over such territory, saving, however, to the said State of California the right to serve civil or criminal process within the limits of the aforesaid parks or either of them in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed in said State outside of said parks; and saving further to the said State the right to tax persons and corporations, their franchises and property on the lands included in said parks, and the right to fix and collect license fees for fishing in said parks; and saving also to the persons residing in any of said parks now or hereafter the right to vote at all elections held within the county or counties in which said parks are situated. All the laws applicable to places under sole and exclusive jurisdiction of the United States shall have force and effect in said parks or either of them. All fugitives from justice taking refuge in said parks, or either of them, shall be subject to the same laws as refugees from justice found in the State of California."

power under the Constitution to exercise exclusive juris-
diction over land ceded to it by a State for national park
purposes. Pursuant to the Act of August 24, 1937, the
Court certified to the Attorney General that in this cause
was drawn in question the constitutionality of the Acts
of June 11, 1906, 34 Stat. 831, and June 2, 1920, 41 Stat.
731, accepting exclusive jurisdiction over the areas which
embrace the Yosemite National Park. The United
States, regarding appellee's argument as adequate, de-
termined that it was not necessary to intervene.

*Exclusive jurisdiction.* By the Act of March 3, 1905,
see note 7, California ceded and granted the United
States title to the "Cleft" or "Gorge," known as Yo-
semite Valley and the Mariposa Big Tree Grove. As the
Act of March 31, 1891, was then in force, see note 6,
exclusive jurisdiction, with the exception of right to ad-
minister criminal laws and serve civil process, passed
to the United States, on its acceptance, unless the United
States was without constitutional power to exercise it.
By the Act of June 11, 1906, see note 8, the Congress
accepted the cession and made the lands conveyed a part
of the Yosemite National Park. The other lands com-
posing the Park had been in the proprietorship of the
national government since cession by Mexico. Exclusive
jurisdiction of them passed from the United States to
California by the admittance of that State to the Union.
Except for certain rights expressly reserved, exclusive
jurisdiction of these lands was granted to the United
States by the Act of April 15, 1919, see note 9, and ac-
cepted by the Congress on June 2, 1920, see note 10. As
this Act granted exclusive jurisdiction over all "terri-
tory which is now or may hereafter be . . . included
in . . . Yosemite National Park," the language of
the cession and acceptance is apt to determine exclusive
jurisdiction, with the explicit reservations, of the Gorge
also.

Whatever the existing status of jurisdiction at the time of their enactment, the Acts of cession and acceptance of 1919 and 1920 are to be taken as declarations of the agreements, reached by the respective sovereignties, State and Nation, as to the future jurisdiction and rights of each in the entire area of Yosemite National Park. As jurisdiction over the Gorge was created by one set of statutes and that over the rest of the Park by different legislation, this adjustment was desirable. The States of the Union and the National Government may make mutually satisfactory arrangements as to jurisdiction of territory within their borders and thus in a most effective way, coöperatively adjust problems flowing from our dual system of government.[11] Jurisdiction obtained by consent or cession may be qualified by agreement or through offer and acceptance or ratification.[12] It is a matter of arrangement. These arrangements the courts will recognize and respect.

The State urges the constitutional inability of the National Government to accept exclusive jurisdiction of any land for purposes other than those specified in Clause 17, § 8, Article I of the Constitution.[13] This clause has not been strictly construed. This Court at this term has given full consideration to the constitutional power of

---

[11] Cf. *Fort Leavenworth R. Co.* v. *Lowe*, 114 U. S. 525, 541; *Hinderlider* v. *LaPlata River & Cherry Creek Ditch Co., ante*, pp. 92, 104.

[12] *James* v. *Dravo Contracting Co.*, 302 U. S. 134, 146; *Silas Mason Co.* v. *Tax Commission*, 302 U. S. 186, 203; *Fort Leavenworth R. Co.* v. *Lowe, supra; Surplus Trading Co.* v. *Cook*, 281 U. S. 647, 651.

[13] "To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings; . . ."

the United States to acquire land under Clause 17 without taking exclusive jurisdiction.[14]  In that case, it was said: "Clause 17 contains no express stipulation that the consent of the State must be without reservations.  We think that such a stipulation should not be implied.  We are unable to reconcile such an implication with the free-dom of the State and its admitted authority to refuse or qualify cessions of jurisdiction when purchases have been made without consent or property has been acquired by condemnation."  The clause is not the sole authority for the acquisition of jurisdiction.  There is no question about the power of the United States to exercise jurisdiction secured by cession, though this is not provided for by Clause 17.[15]  And it has been held that such a cession may be qualified.[16]  It has never been necessary, heretofore, for this Court to determine whether or not 'the United States has the constitutional right to exercise jurisdiction over territory, within the geographical limits of a State, acquired for purposes other than those specified in Clause 17.  It was raised but not decided in *Arlington Hotel* v. *Fant,* 278 U. S. 439, 454.  It was assumed without discussion in *Yellowstone Park Transportation Co.* v. *Gallatin County,* 31 F. 2d 644.[17]

On account of the regulatory phases of the Alcoholic Beverage Control Act of California, it is necessary to determine that question here.  The United States has large bodies of public lands.  These properties are used for

---

[14] *James v. Dravo Contracting Co.,* 302 U. S. 134, 148.

[15] *Fort Leavenworth R. Co.* v. *Lowe, supra; Chicago, R. I. & P. Ry. Co.* v. *McGlinn,* 114 U. S. 542; *Benson* v. *United States,* 146 U. S. 325; *Arlington Hotel Co.* v. *Fant,* 278 U. S. 439; *United States* v. *Unzeuta,* 281 U. S. 138; *Surplus Trading Co.* v. *Cook,* 281 U. S. 647; *Standard Oil Co.* v. *California,* 291 U. S. 242; *Yellowstone Park Transportation Co.* v. *Gallatin County,* 31 F. 2d 644.

[16] *Fort Leavenworth R. Co.* v. *Lowe, supra.*

[17] Cf. *Rainier Nat. Park Co.* v. *Martin,* 18 F. Supp. 481.

forests, parks, ranges, wild life sanctuaries, flood control, and other purposes which are not covered by Clause 17. In *Silas Mason Co.* v. *Tax Commission of Washington,* 302 U. S. 186, we upheld in accordance with the arrangements of the State and National Governments the right of the United States to acquire private property for use in "the reclamation of arid and semiarid lands" and to hold its purchases subject to state jurisdiction. In other instances, it may be deemed important or desirable by the National Government and the State Government in which the particular property is located that exclusive jurisdiction be vested in the United States by cession or consent. No question is raised as to the authority to acquire land or provide for national parks. As the National Government may, "by virtue of its sovereignty" acquire lands within the borders of states by eminent domain and without their consent,[18] the respective sovereignties should be in a position to adjust their jurisdictions. There is no constitutional objection to such an adjustment of rights. It follows that jurisdiction less than exclusive may be granted the United States. The jurisdiction over the Yosemite National Park is exclusively in the United States except as reserved to California, e. g., right to tax, by the Act of April 15, 1919. As there is no reservation of the right to control the sale or use of alcoholic beverages, such regulatory provisions as are found in the Act under consideration are unenforceable in the Park.

*Interpretation of Reservations.* The lower court, in interpreting the language of the Acts of grant and acceptance was of the opinion that the saving of "the right to tax persons and corporations, their franchises and property" was not sufficiently broad to justify the collec-

---

[18] *James* v. *Dravo Contracting Co., supra,* 147; *Kohl* v. *United States,* 91 U. S. 367, 371, 372.

tion of fees for licenses under § 5 and sales under §§ 23 and 24 of the Alcoholic Beverage Control Act.[19] The retention of the right to charge license fees for fishing

[19] "Sec. 5. The following are the types of licenses to be issued under this act and the annual fees to be charged therefor.

1. Beer manufacturer's license_____ $750.00 per year
2. Wine manufacturer's license (to be computed only on the gallonage manufactured) five thousand gallons or less_ 20.00 per year
Over five thousand gallons to twenty thousand gallons per year _____ 40.00 per year
Over twenty thousand to one hundred thousand gallons per year_____ 75.00 per year
Over one hundred thousand to two hundred thousand gallons per year_____ 100.00 per year
Over two hundred thousand gallons to one million gallons a year_____ 150.00 per year
For each million gallons or fraction thereof over a million gallons an additional_____ 100.00 per year
3. Distilled spirits manufacturer's license_____ 250.00 per year
4. Still license _____ 10.00 per year per still
5. Rectifier's license_____ 250.00 per year
6. Brandy manufacturer's license_____ 150.00 per year
7. Distilled spirits importer's license_____ no fee
8. Wine importer's license_____ no fee
9. Beer importer's license_____ no fee
10. Public warehouse license_____ 10.00 per year
11. Wine bottling or packaging license_____ 10.00 per year
12. Beer bottling or packaging license_____ 500.00 per year
13. Distilled spirits wholesaler's license_____ 250.00 per year
14. Beer and wine wholesaler's license_____ 50.00 per year
15. Broker's license_____ 250.00 per year
16. Retail package off-sale beer and wine license_____ 10.00 per year
17. Retail package off-sale distilled spirits license for the first $10,000 retail sales per year_____ 100.00 per year
For each $1,000 retail sales or fraction thereof over $10,000 per year_____ 10.00 per year
18. Industrial alcohol dealer's license_____ 50.00 per year
19. On-sale beer license_____ 25.00 per year
20. On-sale beer and wine license_____ 75.00 per year
21. On-sale beer and wine license for trains (per train)_____ 15.00 per year
22. On-sale beer and wine license for boats (per boat)_____ 50.00 per year
23. On-sale distilled spirits license_____ As set by the board
24. Distilled spirits manufacturer's agents license_____ 250.00 per year"

"Sec. 23. An excise tax is hereby imposed upon all beer and wine sold in this State by a manufacturer or importer, except as otherwise in this act provided, at the following rates:

"(a) On all beer, sixty-two cents for every barrel containing thirty-one gallons, and at a proportionate rate for any other quantity;

"(b) On all natural dry wines one cent per wine gallon and at a proportionate rate for any other quantity; (c) on all other still wines two cents per wine gallon and at a proportionate rate for any other

was considered an indication of abandonment of the right to enforce any other license fees; and finally, the regulatory character of the California enactment was deemed to mark it as non-enforceable under the reservation of the right to tax.

As the respective acts of State and Nation were in the nature of a mutual declaration of rights, this is not an occasion for strict construction of a grant by a State limiting its taxing power. Without employing that rule, we are of the opinion that this language is sufficiently broad to cover excises on sales,[20] but not the license fees

quantity; (d) on champagne, sparkling wine, except sparkling hard cider, whether naturally or artificially carbonated one and one-half cents per half pint or fraction thereof, three cents per pint or fraction thereof greater than one-half pint, six cents per quart or fraction thereof greater than one pint; (e) on sparkling hard cider two cents per wine gallon and at a proportionate rate for any other quantity." Statutes 1937, ch. 758; operative July 1, 1937.

"Sec. 24. An excise tax is hereby imposed upon all distilled spirits sold in this State by rectifiers or wholesalers thereof, at the following rates:

"On all distilled spirits of proof strength or less, two cents on each bottle containing two ounces or fraction thereof; five cents on each bottle containing eight ounces or fraction thereof greater than two ounces; ten cents on each bottle containing one pint or fraction thereof greater than a half-pint; sixteen cents on each bottle containing one-fifth gallon or fraction thereof greater than one pint; twenty cents on each bottle containing one quart or fraction thereof greater than one-fifth gallon; forty cents on each bottle containing one-half gallon or fraction thereof, greater than one quart; eighty cents on each bottle containing one gallon or fraction thereof greater than one-half gallon, and at a proportionate rate for any quantity.

"All distilled spirits in excess of proof strength shall be taxed at double the above rate." Statutes 1937, ch. 758; operative July 1, 1937.

[20] *Mid-Northern Oil Co.* v. *Walker*, 268 U. S. 45, 49; *Rainier Nat. Park Co.* v. *Martin*, 18 F. Supp. 481, 486, affirmed, 302 U. S. 661, on the authority of the *Walker* case.

In this view we need not consider appellants' argument that the Constitution of California forbids the release of the taxing power.

provided for by this Act. The fact that the "right to fix and collect license fees for fishing in said parks" was reserved, is not decisive. It may well be that the negotiators of the agreement considered such licenses regulatory in nature and therefore requiring express exception from the agreement for exclusive jurisdiction, in addition to the tax exception.

(a) *Licenses.* As the State of California has in the area of the Yosemite National Park only the jurisdiction saved under the cession and acceptance acts of 1919 and 1920, it does not have the power to regulate the liquor traffic in the Park. Except as to this reserved jurisdiction, California "put that area beyond the field of operation of her laws." [21] While the State has, under its reservation, the right to use means to force collection of the taxes saved,[22] it seems clear that the licenses required by § 5 go beyond aids to the collection of taxes and are truly regulatory in character. This is not a case where provisions requiring a license may be treated as separable from regulations applicable to those licensed.[23] Here the regulatory provisions appear in the form of conditions to be satisfied before a license may be granted.[24] The pro-

---

[21] *Standard Oil Co.* v. *California*, 291 U. S. 242.

[22] *Rainier National Park* v. *Martin*, 18 F. Supp. 481, 488.

[23] Cf. *Electric Bond & Share Co.* v. *Securities & Exchange Comm'n*, 303 U. S. 419.

[24] Art. XX, § 22, of the California Constitution provides that the State Board of Equalization "shall have the power, in its discretion, to deny or revoke any specific liquor license if it shall determine for good cause that the granting or continuance of such license would be contrary to public welfare or morals."

The Alcoholic Beverage Control Act, Cal. Stat. 1935, c. 330, as amended Stat. 1937, c. 681, c. 758, contains, inter alia, provisions that no person may perform acts authorized by a license, unless licensed (§ 3); that an importer's license may be issued only to the holder of a manufacturer's, rectifier's, or wholesaler's license, § 6 (d); that appli-

visions requiring licenses for the importation or sale of alcoholic beverages in the Park are invalid.

(b) Excise Taxes. A different conclusion obtains, however, with respect to the excise tax provisions of the Alcoholic Beverage Control Act, laying a tax, at a specified rate per unit sold, on beer, wine, and distilled spirits sold "in this State." The Park Company, seeking to bring the excise provisions of the Act within the principle stated above with respect to the license fee provisions, contends that, notwithstanding the separability clause,[25] the taxing features cannot be separated from the regulatory features, and that "the Act does not even purport to tax persons not subject to licensing requirements." Thus the argument is made that § 23 imposes an excise tax on beer and wine sold by an importer, and applies not to the Company, which sells beverages direct to consumers, but only to importers licensed under the Act, and restricted by their license to sales to retail licensees.

cation of a required type be filed for a license (§ 10); that no on-sale distilled spirits license shall be issued to any applicant who is not a citizen of the United States (§ 12); that no distilled spirits license may be issued to any person or agent of any person who manufactures distilled spirits within or without the State (§ 20½); that retail licenses may not be granted for premises in certain locations (§§ 13–17); that no retail on-sale or off-sale licensee shall purchase alcoholic beverages for resale from any person except a person holding a beer, or wine, manufacturer's, a rectifier's or a wholesaler's license issued under this act (§ 6.6).

[25] "Sec. 70. If any section, subsection, clause, sentence or phrase of this act which is reasonably separable from the remaining portion of this act is for any reason held to be unconstitutional, such decision shall not affect the remaining portions of this act. The Legislature hereby declares that it would have passed the remaining portions of this act irrespective of the fact that any such section, subsection, clause, sentence or phrase of this act be declared unconstitutional."

Neither party cites any pertinent state court decision. There is nothing in the statute itself compelling the conclusion that the excise tax and regulatory provisions are inseparable, or requiring the Court to overturn the presumptively correct determination of the administrative officers that the sales within the Park are subject to the excise tax. Section 23 provides that an excise tax is imposed upon beer and wine sold "in this State by [an] . . . importer." Reference to provisions of the Act defining the terms used in this section [26] makes it plain that although appellee Company does not import beverages into California within the meaning of the Twenty-First Amendment, it is an importer for purposes of the Act, and, as such, is subject to the tax. The Act is restricted to sales "in this State," but that term embraces all territory within the geographical limits of the State.[27] There is nothing in the Act restricting this taxing provision to sales made by or to persons licensed under the Act. Sec. 23 clearly applies to beer and wine sold by appellee Company in the Park, and it applies to such sales regardless of the applicability *vel non* of the regulatory or licensing provisions of the Act.

Section 24 imposes an excise tax upon all distilled spirits "sold in this State by rectifiers or wholesalers." Appellee Company does not come within the statutory

---

[26] Sec. 2 (k): "'Importer' means any consignee of alcoholic beverages brought into this State from without this State when such alcoholic beverages are for delivery or use within this State, . . ." Sec. 2 (w): "'Within this State' means all territory within the boundaries of this State." Sec. 2 (wl): "'Without the State' means all territory without the boundaries of the State."

[27] See *supra,* note 26. See boundary of State of California as defined in Cal. Const., Art. XXI, § 1.

Compare *Rainier Nat. Park Co.* v. *Martin,* 18 F. Supp. 481, 486 (W. D. Wash.), affirmed 302 U. S. 661.

definition of either of these groups,[28] but § 24 must be read in conjunction with § 33. Sec. 33 provides that the "tax imposed by § 24 of this act upon the sale of distilled spirits shall be collected from rectifiers and wholesalers of distilled spirits and payment of the tax shall be evidenced by stamps issued by the board to such rectifiers and wholesalers," and continues with the provision that "in exceptional instances the board may sell such stamps to on- and off-sale distilled spirits licensees and *other persons*." (Italics added.) In view of the atypical circumstances of the present case, we cannot consider erroneous an interpretation by the board that stamps, to be affixed to the liquor containers, might be issued and sold to appellee Company. These provisions, like § 23, are independent of any licensing or regulatory provisions of the Act, and may be enforced independently, as a purely tax or revenue measure.

The objection that collection of the taxes may not only interfere with an agency of the United States but may be actually partly collected from the National Government because of its interest in the profits under the contract is fully answered by the fact that the United States, by its acceptance of qualified jurisdiction, has consented to such a tax.[29]

*XXI Amendment.* The State makes the point that § 2 of the XXI Amendment[30] gives it the right to regulate

---

[28] Sec. 2 (j) "'Rectifier' means every person who colors, flavors, or otherwise processes distilled spirits by distillation, blending, percolating or other processes."

(s) "'Wholesaler' means and includes every person other than a manufacturer or rectifier who is engaged in business as a jobber or wholesale merchant, dealing in alcoholic beverages."

[29] *Rainier Nat. Park Co.* v. *Martin,* 302 U. S. 661; cf. *Baltimore Nat. Bank* v. *State Tax Comm'n,* 297 U. S. 209.

[30] "Sec. 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

the importation of intoxicating liquors. Reliance for en-
forcement is placed upon §§ 49 and 49.2 of the Alcoholic
Beverage Control Act.[31] The argument for this claim is
bottomed upon our decision in *State Board of Equaliza-
tion* v. *Young's Market Co.*, 299 U. S. 59, where we held
that a statute imposing a $500 license fee for importing
and a $750 license fee for brewing beer did not violate

[31] "Sec. 49. Alcoholic beverages shall be brought into this State from
without this State for delivery or use within the State only when
such alcoholic beverages are consigned to a licensed importer and
only when consigned to the premises of such licensed importer or to
the premises of a public warehouse licensed under this act. Alcoholic
beverages which are consigned to a destination within this State shall
be presumed to be for delivery or use within this State. Alcoholic
beverages imported into this State contrary to the provisions hereof
shall be seized by the board. Every person violating the provisions
of this section shall be guilty of a misdemeanor." Statutes 1937, ch.
758; operative July 1, 1937.

"Sec. 49.2. Common or private carriers transporting alcoholic bev-
erages into this State from without the State for delivery or use
within this State must obtain the receipt of the licensed importer,
distilled spirits manufacturer or distilled spirits manufacturer's agent
for the alcoholic beverages so transported and delivered and, if the
consignee refuses to give such receipt and show his license to the car-
rier, the carrier shall be relieved of all responsibility for delivering
said alcoholic beverages. Where the consignee is not a licensed im-
porter, distilled spirits manufacturer or distilled spirits manufacturer's
agent or where the consignee refuses to give his receipt and show his
license the carrier shall immediately notify the board at Sacramento
giving full details as to the character of shipment, point of origin,
destination and address of the consignor and consignee, and within
ten days such alcoholic beverages shall be delivered to the board and
shall be forfeited to the State of California. If any alcoholic beverages
seized under the preceding section or forfeited under this section are
sold by or under the direction of the board the common carrier's un-
paid freight and storage charges accruing on the shipments of such
alcoholic beverages shall be satisfied out of the proceeds of any sale
made by the State after deducting the cost of such sale and any excise
taxes accruing thereon. Every person violating the provisions of this
section shall be guilty of a misdemeanor." Statutes 1937, ch. 758;
operative July 1, 1937.

the commerce clause or the equal protection clause, because the words of the XXI Amendment "are apt to confer upon the State the power to forbid all importations" and "the State may adopt a lesser degree of regulation than total prohibition" (pp. 62, 63).[32] The lower court was of the opinion that though the Amendment may have increased "the state's power to deal with the problem . . . , it did not increase its jurisdiction." With this conclusion, we agree. As territorial jurisdiction over the Park was in the United States, the State could not legislate for the area merely on account of the XXI Amendment.[33] There was no transportation into California "for delivery or use therein." The delivery and use is in the Park, and under a distinct sovereignty. Where exclusive jurisdiction is in the United States, without power in the State to regulate alcoholic beverages, the XXI Amendment is not applicable.[34]

*Conclusion.* The bill of complaint states that the defendants, the state officials, "assert that said Alcoholic Beverage Control Act of the State of California applies to complainant's operations within said Yosemite National Park; . . . that it is obligated to pay the fees and taxes imposed by said Act and is subject to the penalties thereof for the possession and sale of said beverages without compliance with the provisions of said Act." In the prayer of the bill, the complainant prays for an injunction restraining the defendants "from enforcing in any manner within the limits of Yosemite National Park, or in respect of transactions within said Park, the Alcoholic Beverage Control Act of the State of California."

---

[32] The conclusions have been reiterated in *Mahoney* v. *Joseph Triner Corp., ante,* p. 401.

[33] *Standard Oil Co.* v. *California,* 291 U. S. 242.

[34] Compare *Western Union Telegraph Co.* v. *Chiles,* 214 U. S. 274; *Yellowstone Park Transportation Co.* v. *Gallatin County,* 31 F. 2d 644.

The final decree forbids entering upon the premises of complainant; seizing, impeding or interfering with any shipments to complainant in Yosemite National Park; from instituting any actions or proceedings in any court of law or equity for violations or alleged violations of said Alcoholic Beverage Control Act in respect of the importation, possession or sale in the Park; from requiring or demanding reports on the importation, possession or sale of said beverages; from enforcing in any manner within the limits of Yosemite National Park, or in respect of transactions within said Park, the Alcoholic Beverage Control Act of the State of California.

From the pleadings and decree it is clear that until now the controversy has turned not upon special provisions of the Act in question but upon its applicability as a whole. As in our judgment, as heretofore pointed out, the tax provisions are enforceable and the regulatory provisions unenforceable, it is necessary to reverse the decree and remand the cause to the District Court for a determination by the Court in accordance with this opinion of the applicability of such sections of the Act as the State may threaten to enforce.

*Reversed.*

MR. JUSTICE MCREYNOLDS is of opinion that the decree below should be reversed because as stated by counsel for appellants, "The acts of cession and acceptance reserved to the State the right to levy upon and collect from the appellee company the type of tax imposed by the Alcoholic Beverage Control Act." Also, that discussion should be confined to that point.

MR. JUSTICE CARDOZO took no part in the consideration or decision of this case.