UNITED STATES of America, Plaintiff,

v.

319.88 ACRES OF LAND, MORE OR LESS, SITUATE IN CLARK COUNTY, NEVADA; Laughlin Recreational Enterprises, Inc., a New Mexico Corporation, et al., and Unknown Owners, Defendants.

No. Civ. LV 76–199 RDF.

United States District Court,
D. Nevada.

Sept. 30, 1980.

U. S. Atty. B. Mahlon Brown III, by Wm. C. Turner, Asst. U. S. Atty., Las Vegas, Nev., B. Richard Taylor, Trial Atty., Land and Natural Resources Div., Denver, Colo., Richard Allemann, Asst. U. S. Atty., Phoenix, Ariz., for plaintiff.

Morris & Wood by Donald L. Wood, Las Vegas, Nev., Fadem, Berger & Norton by Jerrold A. Fadem, Santa Monica, Cal., for defendants.

### ORDER GRANTING PLAINTIFF'S MOTION FOR A NEW TRIAL

ROGER D. FOLEY, District Judge.

This is an action by the United States to condemn one half–section of land, comprising 319.88 acres, which is totally surrounded by federal lands within the boundaries of the Lake Mead National Recreation Area, and situated within the State of Nevada, County of Clark, near the town of Laughlin. At trial to a jury, the defendant property owner presented expert testimony that the highest and best use to which the land could be put would be a planned development to include residential housing, recreational home sites, a park, spaces for recreational vehicles, commercial establishments and a hotel–casino. Defendant's expert, Gary H. Kent, M.A.I., S.R.P.A., testified that zoning

for such a development would be readily obtainable despite its present zoning by Clark County only for residential development on tracts of two or more acres. Of course, Mr. Kent's testimony rested in part on the assumption that the legality of licensed gambling within the State of Nevada would permit the location of a casino on the property. Mr. Kent testified that the property's fair market value at the date of commencement of trial was $2,750 per acre, or $880,000. The Government countered with another expert, Mr. Robert F. Temple, M.A.I., A.S.A., who testified that the highest and best use for the property would be residential and recreational homesites and that the value as of the date of trial was $750 per acre, or $240,000. At trial, the issue never having been raised previously, the Government asked the Court to take judicial notice of the following National Park Service regulation:

"Gambling in any form, or the operation of gambling devices, whether for merchandise or otherwise, is prohibited on the federally owned lands of a park area, and on privately owned lands within park areas under the legislative jurisdiction of the United States."

36 C.F.R. § 2.15. Government counsel represented to the Court that he was unaware of the regulation until just prior to trial and did not intentionally cause surprise. Nevertheless, defense counsel and the Court were taken completely by surprise, and neither party was prepared to address adequately the complex issues raised by the existence of the regulation. However, defense counsel did argue that the regulation was an unlawful usurpation of state power and thus invalid. The Court asked the parties to brief the issue of the regulation's validity but, needless to say, such efforts were necessarily limited by lack of time and the continuing progress of the trial. Convinced that the question could not be resolved quickly, and hoping to allow the jury to complete its work and be discharged, this Court, with the agreement of counsel, submitted to the jury special interrogatories asking the jury to find the fair market value of the subject property, assuming in

one instance that a gambling business could lawfully be placed on the premises and assuming in the second instance that such a business was prohibited. The decision to submit special interrogatories was also based, in part, on the possibility that the jury might decide that the legality of gambling on the property was irrelevant to the value of the property and answer both interrogatories identically. Indeed, both counsel argued to the jury that the value should be the same, regardless of legality or illegality of gambling, although arguing for different amounts, defendant for $880,000 and plaintiff for $240,000. The nature of those arguments will be addressed more fully hereafter. The jury in fact returned identical verdicts, answering both interrogatories with the amount of $880,000.

The matter is now before this Court on the motion of the United States for a new trial pursuant to Federal Rules of Civil Procedure 59(a). The motion enumerates nine asserted grounds for a new trial. In essence, however, the Government's attack is only three--pronged. First, the Government argues that the Court erred in admitting into evidence the terms of two "uncompleted transactions" and Mr. Kent's expert opinion as to the value of the property inasmuch as it was based in part upon those transactions. Second, the United States contends that the Court erroneously failed to give conclusive effect to the regulation prohibiting gambling, which would have meant the exclusion of Mr. Kent's testimony based on gambling as an element of his highest and best use determination. Third, the plaintiff asserts that the verdict is excessive and that, therefore, this Court has a duty to set it aside.

This Court is convinced that the merits of this motion depend entirely upon the questioned validity of the anti–gambling regulation of the National Park Service. Even assuming arguendo that the evidence of the uncompleted sales should not have been admitted at trial, this was harmless error. The circumstances under which the two transactions fell through were thoroughly explored at trial – they

were much more than unaccepted offers or the like which clearly cannot be the basis of a determination of fair market value. The Court determined then that the fact that the transactions were never consummated went more to the weight of the transaction than to its admissibility. The Court is unwilling to change that position. The nature and price of the transaction was not such as would induce the jury to attach undue significance to them in the evaluation of Mr. Kent's testimony as to the value of the property. Finally, as to the admissibility of Mr. Kent's testimony inasmuch as it was based in part upon the arguably inadmissible transactions, Rule 703 of the Federal Rules of Evidence clearly indicates that an expert's opinion is admissible even if it is based on inadmissible evidence.

■ As to the argument that the verdict is excessive, the only ground for such a finding of the Court in this case would be that Mr. Kent's testimony was improperly considered with respect to the value of the property if gambling is not a permitted use of the property. At first glance, it would appear that the gambling regulation should be irrelevant. The jury returned identical verdicts on the special interrogatories after counsel for both sides argued that this is what they should do. Nevertheless, if the gambling regulation is valid, the jury award with respect to the value of the property is contrary to the preponderance of competent evidence. It is clear that the jury accepted the valuation of Mr. Kent. Nevertheless, Mr. Kent's testimony was unquestionably based on the assumption that the availability of licensed gambling would increase the value of the property. Licensed gambling was one of the factors emphasized by Mr. Kent to indicate why he relied entirely on Nevada properties, although some Arizona properties might have been more physically and geographically similar to the subject property than the Nevada properties he used in his valuation process. Where the opinion of an expert is

based on erroneous assumptions of fact or law, the evidence is incompetent and insufficient to support a verdict. See *United States v. Honolulu Plantation Co.*, 182 F.2d 172, 178 (9th Cir.), cert. denied, 340 U.S. 820, 71 S.Ct. 51, 95 L.Ed. 602 (1950). See also *Likins–Foster Monterey Corp. v. United States*, 308 F.2d 595, 597 (9th Cir. 1962); 5 *Nichols on Eminent Domain* § 18.45[1], pp. 18–300 to –302 (3d ed. 1972).

The fact that both counsel argued for identical verdicts does not conclude the issue, either. Government counsel could consistently argue for identical verdicts on the two questions. The expert for the Government, Mr. Temple, testified that his opinion as to the value of the property would not change based on a belief that gambling was permitted on the property. As Government counsel pointed out, however, this statement is consistent with his determination that the highest and best use of the property did not include gambling. Government counsel's argument that the jury award should be the same, and based on his expert's opinion, does not preclude him from objecting to identical verdicts based on the defendant's expert's opinion if that opinion will not support a verdict where gambling is prohibited. There is a logical gap in defense counsel's argument for identical verdicts, which was as follows:

"I agree that your two verdicts should be in the same amount. And we have Mr. Temple's testimony, transcript just read to you today,[1] which Mr. Temple agrees to, that he wouldn't change his opinion if he believed gambling was permitted."

It does not follow from Mr. Temple's testimony, to the effect that his valuation would not be any different whether or not gambling was permitted, that Mr. Kent's valuation would not change either. Mr. Kent was never placed on the stand to indicate whether *his* valuation, the one adopted in full by jury, would have been any different if he believed gambling to be prohibited on

1. Argument on the validity of the anti–gambling regulation was taken outside the presence of the jury. During that period, Mr. Temple was called back to the stand, and stated that his valuation would not have been any different if he believed gambling was permitted on the property. Part of his testimony was read to the jury the next day.

the property. Indeed, it is hard to imagine that Mr. Kent could have made such an assertion in view of his adamant insistence that only Nevada sales were comparable in view of the fact, among others, that there was a possibility of establishing a gambling business on the subject property. Therefore, this Court must address the issue of the validity of 36 C.F.R. § 2.15, which purports to prohibit gambling on private property within the boundaries of Lake Mead National Recreation Area.

■ At the outset, the Court notes that the problem is more complex than the Government seems to discern it. The Government appears to argue that the existence of the regulation, coupled with the publication in the Federal Register of the National Park Service's acceptance of Nevada's consent to acquisition of concurrent legislative jurisdiction over the Lake Mead National Recreation Area, 39 Fed.Reg. No. 89 (May 8, 1974), somehow obliges this Court to give the regulation full force and effect as a valid restriction on the use of the subject property. This position is simply untenable. The Federal Register Act, 44 U.S.C. § 1501 et seq., merely eliminates the need for introduction of federal documents as evidence by allowing the courts to take judicial notice of the Federal Register's contents. And although 44 U.S.C. § 1507 does raise a rebuttable presumption that such documents were "duly issued, prescribed, or promulgated," this in no way gives the regulations conclusive effect as substantively valid against a challenge of unconstitutionality or lack of authority on the part of the issuing agency. In this case, the presumption merely determines that the procedural requisites for issuance of the document were satisfied because the defendant has not attempted to show any procedural defect.

■ The Government may be arguing that the regulation is not subject to collateral attack in the condemnation proceeding. But the Government cites no authority for this position and this Court has found none. There is some support for the argument that zoning regulations are not subject to

collateral attack; but that rule does not apply when the condemning authority and the zoning authority are the same. See 4 *Nichols on Eminent Domain* § 12.322, pp. 12–629 to –637. Even when the zoning authority is not the condemnor, some courts have held that the prohibition on collateral attack does not apply when the zoning regulation is void for lack of authority on the part of the zoning entity. See id. at 12–632 n. 5. Thus, by analogy to the zoning restriction cases, the regulation questioned here is open to collateral attack in this condemnation proceeding on two grounds, namely: (1) the identity of the regulating agency and the condemning authority, and (2) the fact that the defendant argues that the National Park Service lacked the power to issue the regulation as it affects privately owned property. Moreover, to apply a rule prohibiting collateral attack in this instance would be particularly harsh. Even Government counsel admitted that he was unaware of the anti–gambling regulation until just before trial, despite the fact that the case was filed almost three and a half years ago. Therefore, it can hardly be argued that the property owner had ample prior opportunity to challenge the regulation directly.

The defendant's challenge to the National Park Service regulation prohibiting gambling is three–fold. First, the defendant maintains that the federal government has attempted to usurp the planning and zoning authority, a legislative function committed by Nevada statute to local government units. Second, the defendant argues that the anti–gambling regulation exceeds the National Park Service's statutory authority under Title 40, U.S.C., § 255, because it attempts to regulate privately owned property. Third, the defendant argues that, even assuming that the Nevada Tax Commission and the Governor could cede legislative jurisdiction over the subject property, the consent to concurrent legislative jurisdiction was limited by the terms of the grant to criminal jurisdiction. The Government has not replied to these arguments, leaving the resolution of these and other complex issues to the Court. Nevertheless,

the Court finds the defendant's arguments unpersuasive.

■ The Ninth Circuit has expressly held that the United States may, by appropriate agreement with the respective states, obtain legislative jurisdiction over privately owned land which is situated within the boundaries of a National Park.

"It was also strongly urged upon the appeal that California was powerless to surrender its jurisdiction to the United States over privately owned lands on the ground that the power to surrender existed only as to federally owned property. But no authority has been submitted nor does independent research reveal any basis for concluding that the sovereign state may not, as a part of its power of sovereignty, cede. part of its jurisdiction over privately owned property to its paramount sovereign in cases like the instant one. To the contrary, it is clear that such cessions of jurisdiction, motivated by the comity between sovereigns, have been found to be lawful and proper for the reason that they are necessary in order to secure the great public benefits intended to be derived from the' dedicated areas. *U. S. v. Unzeuta*, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761; *Arlington Hotel v. Fant*, 278 U.S. 439, 49 S.Ct. 227, 73 L.Ed. 447. See cases cited in the opinion below. *U. S. v. Peterson*, 91 F.Supp. 209, at 212 (S.D.Cal.).

"  . . .

"  . . .

"We find no constitutional bar which prevented the State of California from ceding jurisdiction to the Federal Government over the privately owned Wilsonia area lying wholly within and surrounded by the acreage making up Kings Canyon National Park."

*Petersen v. United States*, 191 F.2d 154, 156–57 (9th Cir.), cert. denied sub nom. *California v. United States*, 342 U.S. 885, 72 S.Ct. 174, 96 L.Ed. 664 (1951). See also *Macomber v. Bose*, 401 F.2d 545 (9th Cir. 1968).

While not controlled by the provisions of clause 17, § 8, Article I of the United States Constitution, which relates only to consent by the states to the exercise of exclusive jurisdiction by the United States over property to which the United States acquires title, the principles governing a state cession of legislative jurisdiction over private lands are clearly analogous to those applicable under the constitutional provision. See generally *Collins v. Yosemite Park & Curry Co.*, 304 U.S. 518, 529, 58 S.Ct. 1009, 1014, 82 L.Ed. 1502, 1509 (1938). Indeed, in most instances, it is likely that consent to the jurisdiction over the federally acquired lands and over the related privately owned lands would occur at the same time. As the Ninth Circuit did in *Petersen*, the Supreme Court has treated the grant by the state and the acceptance by the United States [2] as an agreement to adjust the respective jurisdictions to meet special circumstances that arise by virtue of federal ownership and control of property within the several states. The statutes and documents authorizing and evidencing such an adjustment determine the extent of the federal jurisdiction in a given situation.[3] See *Paul v. United States*, 371 U.S. 245, 264–69, 83 S.Ct. 426, 437–440, 9 L.Ed.2d 292, 304–07 (1963); *Collins v. Yosemite Park & Curry Co.*, supra, 304 U.S. at 528–30, 58 S.Ct. at 1013–14, 82 L.Ed. at 1509–10; *James v. Dravo Contracting Co.*, 302 U.S. 134, 143–49, 58 S.Ct. 208, 213, 82 L.Ed. 155, 163–66 (1937). See also *United States v. Brown*, 552 F.2d 817 (8th Cir.), cert. denied, 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977). The jurisdiction conferred on the United States may range from exclusive jurisdiction, as was the situation in *Petersen*, through concur-

**2.** Although the Constitution does not require the United States to formally accept a grant of jurisdiction by the states, this is a statutory requirement. See Title 40, U.S.C., § 255.

**3.** The situation is somewhat more complex where the United States actually acquires the property in question because the federal government then has certain inherent jurisdiction by virtue of the Property Clause, United States Constitution, Art. IV, § 3, cl. 2. See *Kleppe v. New Mexico*, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976).

rent jurisdiction to partial jurisdiction, depending upon the terms of the consent by the state. "[A] State may condition its 'consent' upon its retention of jurisdiction over the lands consistent with the federal use." *Paul v. United States*, supra, 371 U.S. at 265, 83 S.Ct. at 438, 9 L.Ed.2d at 305. By virtue of the Supremacy Clause, any state regulation issued on the basis of concurrent jurisdiction must give way before a conflicting federal restriction. See generally *Kleppe v. New Mexico*, 426 U.S. 529, 543, 96 S.Ct. 2285, 2293, 49 L.Ed.2d 34, 45–46 (1976).

Having determined that the State of Nevada has the power to cede jurisdiction over the subject property to the United States, this Court must now examine exactly what the State of Nevada did. Purporting to act pursuant to Chapter 328 of the Nevada Revised Statutes,[4] the Nevada Tax Commission issued a "Certificate of Consent of State of Nevada to Acquisition of Concurrent Legislative Jurisdiction by the United States," dated February 11, 1974. This Certificate was countersigned by the Governor. The operative language of this Certificate states:

"NOW, THEREFORE, the Nevada Tax Commission, acting on behalf of the State of Nevada, hereby certifies that the State of Nevada has consented to the acquisition of concurrent legislative jurisdiction over the attached–described real property by the United States Department of Interior, subject to the reservation in the State of Nevada, of the right to serve therein and thereon its civil and criminal process upon persons for violations of the laws of the State occurring elsewhere in the State."

Attached to the Certificate is what purports to be the legal description of that portion of the Lake Mead National Recreation Area which is situated in Clark County, Nevada, and which in fact includes the piece of real property which is the subject of this condemnation action. The National Park Service, purporting to act pursuant to Title 40, U.S.C., § 255, accepted the concurrent jurisdiction granted by the Certificate of the Nevada Tax Commission on April 22, 1974, and notice was published in the Federal Register of May 8, 1974. 39 Fed.Reg. No. 89.

4. **"328.206 Acquisition, relinquishment of legislative jurisdiction by United States: Procedure; notice of intention; consent by Nevada tax commission; filing, recording of documents.**

"1. In order to acquire all or any measure of legislative jurisdiction of the kind involved in clause 17 of section 8 of article I of the Constitution of the United States over any land or other area, or in order to relinquish such legislative jurisdiction, or any measure thereof, which may be vested in the United States, the United States, acting through a duly authorized department, agency or officer, shall file with the Nevada tax commission a notice of intention to acquire or relinquish such legislative jurisdiction. Certified copies of such notice, in sufficient number to meet the recording requirements of subsection 3, shall be filed with the notice. The notice shall contain a description adequate to permit accurate identification of the boundaries of the land or other area for which the change of jurisdictional status is sought and a precise statement of the measure of legislative jurisdiction sought to be transferred.

"2. Upon a finding by a majority of the members of the Nevada tax commission that a proposed acquisition or relinquishment of legislative jurisdiction and the method there-

of and all matters pertaining thereto are consistent with the best interests of the state and conform to the provisions of NRS 328.206 to 328.209, inclusive, the Nevada tax commission may give the consent of the State of Nevada to the acquisition or relinquishment of such legislative jurisdiction by the United States.

"3. If the Nevada tax commission consents to the transfer or relinquishment of such jurisdiction, the consent of the state shall be evidenced by a certificate executed on behalf of the state by the Nevada tax commission and concurred in and countersigned by the governor. Thereafter, the certificate shall be delivered to the secretary of state, who shall affix the seal of the state thereto, and shall thereupon deliver the certificate to the United States. The Nevada tax commission shall cause a copy of the certificate to be recorded in the office of the county recorder where the land or other area affected by the transfer of jurisdiction is situated, and upon such recordation, the transfer of jurisdiction shall take effect. If the land or other area is situated in more than one county, a copy of the certificate shall be recorded in the office of the county recorder of each such county.

■ The defendant argues that the Tax Commission and the Governor being part of the executive branch cannot grant legislative jurisdiction to the United States. However, by statute the Nevada legislature has entrusted to the Tax Commission the obligation to protect the best interests of the state in matters involving the transfer of legislative jurisdiction to the United States. NRS 328.206(2). Upon appropriate findings, the Tax Commission is empowered to issue a certificate manifesting the state's consent to the transfer or relinquishment of jurisdiction, which must be concurred in and countersigned by the Governor. NRS 328.206(3). The defendant has pointed out no reason why this delegation of legislative power is improper. This Court agrees with the opinion of the Nevada Attorney General to the effect that the statute sets forth adequate guidelines to direct the administrative exercise of the delegated legislative power and is therefore proper. See Nev. Att'y Gen.Op.No. 101 (Nov. 16, 1972). The Certificate issued in this case sets forth findings of the Tax Commission which satisfy the statutory requirements.

■ Next, defendant argues that the grant of jurisdiction was limited to criminal jurisdiction, by virtue of the following clause from the Certificate:

"WHEREAS, the application for permission to acquire concurrent legislative jurisdiction over the attached–described parcel of real property is for the purpose of enhancing the police jurisdiction of the guard force presently assigned security duties in the Lake Mead Recreation Area . . ."

First of all, it is not at all clear that even accepting the defendant's argument would require this Court to strike down the regulation as applied to the subject property. The National Park Service is empowered to enact all regulations deemed "necessary or proper for the use and management of the parks, monuments, and reservations under [its] jurisdiction" and to impose punishment "by a fine of not more than $500 or imprisonment for not exceeding six months or both." 16 U.S.C. § 3. The applicability of National Park Service regulations to the Lake Mead National Recreation Area is expressly authorized by 16 U.S.C. § 460n–5, which also explicitly states that "Any person who violates a rule or regulation . . . shall be guilty of a misdemeanor." Thus, the regulation clearly comes within the rubric of "criminal jurisdiction," despite its arguable effect on what defendant calls "land use jurisdiction." But more fundamentally, defendant's argument fails to recognize that the clause claimed to limit the grant of jurisdiction is simply a part of what might be termed the "preamble" to the grant of jurisdiction, included by way of information in setting out the findings of the Tax Commission to justify the grant. This clause does not limit the extent of the actual grant of jurisdiction. The only limitations on the grant are those express reservations made in the operative language of the grant and probably those reservations required by Nevada statute NRS 328.207,[5]

5. **"328.207 Minimum conditions to be met by United States if transfer of jurisdictional status is to take place.** No transfer of legislative jurisdiction between the United States and this state shall take effect nor shall the Nevada tax commission consent to any transfer of legislative jurisdiction unless under the applicable laws of the United States:

"1. This state shall have jurisdiction to tax private persons, private transactions, and private property, real and personal, resident, occurring, or situated within such land or other area to the same extent that this state has jurisdiction to tax such persons, transactions, and property resident, occurring, or situated generally within this state.

"2. Any civil or criminal process lawfully issued by competent authority of this state or any of its political subdivisions may be served and executed within such land or other area to the same extent and with the same effect as such process may be served and executed generally within this state, except that the service and execution of such process within land or other areas over which the Federal Government exercises jurisdiction shall be subject to such rules and regulations issued by authorized officers of the Federal Government, or of any department, independent establishment or agency thereof, as may be reasonably necessary to prevent interference with the carrying out of federal functions.

none of which would affect the regulation here in question. While a transfer of jurisdiction is to be strictly construed, *Six Cos. v. DeVinney*, 2 F.Supp. 693, 697 (D.Nev. 1933), the effective language of the grant is clear and unambiguous. There is no reason to resort to the prefatory, declaratory language to resolve a dispute as to the extent of jurisdiction granted by the State of Nevada to the United States.

██ Although the defendant has not raised the issue, it might be argued that NRS 328.206 does not authorize the Nevada Tax Commission to transfer to the United States legislative jurisdiction over private property. That statute speaks of federal acquisition of "all or any measure of legislative jurisdiction of the kind involved in clause 17 of section 8 of article I of the Constitution of the United States." Under the strict construction rule of *Six Cos. v. DeVinney*, supra, the reference to the Constitution might indicate that the Nevada legislature delegated to the Tax Commission only the power to consent to federal jurisdiction over property actually acquired by the United States. But NRS 328.207, enacted as part of the same bill as NRS 328.206, 1960 Nev.Stats. 366, clearly contemplates the transfer of jurisdiction over privately owned property, because one of the required reservations is the power to tax "private property, real and personal, . . . situated within such land or other area." Therefore, this Court finds that the Nevada Tax Commission has the power to transfer legislative jurisdiction over privately owned land in connection with a request for such jurisdiction by an agency of the United States, and did in fact consent to concurrent federal jurisdiction over the subject property.

> "3. This state shall exercise over such land or other areas the same legislative jurisdiction which it exercises over land or other areas generally within this state, except that the United States shall not be required to forego such measure of exclusive legislative jurisdiction as may be vested in or retained by it over such land or other area pursuant to NRS 328.206 to 328.209, inclusive, and with-

██ Finally, the defendant argues that the National Park Service had no authority to accept jurisdiction over the subject property or to issue regulations applicable to private property. Section 255, 40 U.S.C., permits authorized officers to "accept or secure from the State in which any lands or interests therein under his immediate jurisdiction, custody, or control are situated, consent to or cession of such jurisdiction, exclusive or partial, not theretofore obtained, over any such lands or interests." [6] Although the relevant portion of § 255 begins with a reference to land "acquired," that clause simply negatives the possible notion that the federal government should always demand exclusive jurisdiction over the properties acquired. This in no way limits the authority of the federal officers to accept jurisdiction as to nonacquired property.

"Although 54 Stat. 1083 (1940), 40 U.S.C.A. § 255, pursuant to which the Secretary of the Interior acted on behalf of the United States, authorizes the head of a department only to accept 'cession of * * * jurisdiction, exclusive or partial, not theretofore obtained, over * * * lands or interests [under his immediate jurisdiction, custody, or control] * *', this statute merely provides a method of accepting a cession of jurisdiction, *Adams v. United States*, 1943, 319 U.S. 312, 314, 63 S.Ct. 1122, 1123, 87 L.Ed. 1421, and is not to be construed to limit either as to character or ownership the lands over which federal jurisdiction may be assumed."

*United States v. Petersen*, 91 F.Supp. 209, 212 (S.D.Cal.1950), aff'd, 191 F.2d 154 (9th Cir.), cert. denied (see cite p. 768), 342 U.S. 885, 72 S.Ct. 174, 96 L.Ed. 664 (1951). Therefore, the National Park Service was within its authority in accepting Nevada's cession of concurrent legislative jurisdiction

> out prejudice to the right of the United States to assert and exercise such concurrent legislative jurisdiction as may be vested in or retained by it over such land or other area."

**6.** As used here, "partial" jurisdiction has the meaning of any jurisdiction less than exclusive, which, of course, includes concurrent jurisdiction.

772

over the Lake Mead National Recreation Area, including the private property encompassed within its boundaries. Once jurisdiction is vested in the United States, the authority of the National Park Service to issue regulations with respect to the property arises by virtue of the statutes creating the National Park Service and the Lake Mead National Recreation Area. See 16 U.S.C. § 3, 460n–5. By virtue of that authority, the National Park Service acted within its authority to apply the anti–gambling regulation, 36 C.F.R. § 2.15, to the entire area within the boundaries of the Lake Mead National Recreation Area, notwithstanding the legality of licensed gaming within the State of Nevada. The Supremacy Clause requires that any state regulation must give way in face of a conflicting federal regulation. Therefore, gambling on the property, which is the subject of this condemnation action, would not be a permissible use.

In view of the foregoing finding that the National Park Service properly prohibited gambling on the subject property, this Court finds that Mr. Kent's expert testimony, being based in part upon the erroneous assumption that gambling was a permissible use of the subject property, is not legally competent. The jury's verdict is excessive in that it is not supported by competent, substantial evidence and therefore must be set aside along with the judgment entered by the Clerk of the Court. The cause of action will be set down for a new trial pursuant to the motion of the United States.