### YOSEMITE PARK & CURRY CO. v. COLLINS et al., Board of Equalization of California.

#### No. 4165.

District Court, N. D. California, S. D.

Oct. 25, 1937.

Brobeck, Phleger & Harrison, of San Francisco, Cal., for plaintiff.

Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., amicus curiæ.

U. S. Webb, Atty. Gen., and Seibert L. Sefton, Deputy Atty. Gen., for defendant.

Before WILBUR, Circuit Judge, and ST. SURE and ROCHE, District Judges.

ROCHE, District Judge.

The question in this case deals with the applicability of the "Alcoholic Beverage Control Act of the State of California"[1] in all its taxing, licensing, and policing provisions, to the Yosemite National Park located within the territorial limits of California.

The answer depends upon the respective jurisdictions of the state and the United States over the Park, and this in turn revolves around the methods by which, and the extent to which, the federal government may acquire jurisdiction of lands ceded to it by states for national park purposes. The Supreme Court in Arlington Hotel Co. v. Fant, 278 U.S. 439, 454, 49 S.Ct. 227, 230, 73 L.Ed. 447, characterized the question as novel, saying: "This issue may in the future become a subject of constitutional controversy, because some twenty or more parks have been created by Congress, in a number of which exclusive jurisdiction over the land has been conferred by act of cession of the state. We do not find it necessary, however, now to examine this question."

Briefly, the Beverage Control Act is a complete liquor regulation measure for California.[1] It provides for various licensing fees of importers, retailers, and wholesalers. It has a schedule of excise taxes applicable to the sale of different types of

---

[1] St. 1935, c. 330, p. 1123.

liquors and wines and beers. It has definite provisions for the areas within which liquor may be sold. It gives state officers the right to prescribe the accounting and bookkeeping systems which dealers in liquors must use. It enables the State Board of Equalization, which administers the act, to require liquor dealers to obtain the indorsement of a certain number of property owners in the area where the dealers are to be licensed, and to furnish bond for security of tax collection. It has also many other features which make it extremely comprehensive and which give the State Board of Equalization complete regulatory power.

Plaintiff, the Yosemite Park & Curry Company, is seeking to enjoin the State Board of Equalization and the State Attorney General from enforcing the Beverage Control Act within the Park. Plaintiff is engaged in the operation of hotels, camps, stores, transportation facilities, utilities, and other businesses within the Park. There is a contract between the plaintiff and the Secretary of the Interior leasing portions of the Park to plaintiff for a 20-year term. The intent of the contract is to carry out the congressional desire to make the Park a resort and playground for the benefit of the public (Contract, art. VI (d). The contract places upon plaintiff the duty of furnishing the aforementioned facilities for the accommodation of visitors in the Park. A part of such duty is the sale of liquors, beers, and wines to Park visitors. It is in respect to these alcoholic beverages that the state threatens to take action under its Beverages Control Act. The prices which plaintiff can charge can be established only with the approval of the Secretary of the Interior (Contract, art. VI (e). Plaintiff is limited to an annual 6 per cent. cumulative return upon its investment (Contract, art. VI (b) 2). It must pay to the Secretary of the Interior $5,000 a year as rent for the first 10 years (Contract, art. VI (b) 1). If it earns more than 6 per cent. and declares excess dividends, 25 per cent. of the amount so declared must go to the Secretary of the Interior (Contract, art. VI (b) 6). During the second 10 years, plaintiff is excused from the $5,000 payments and need only pay 22½ per cent. of its excess dividends to the Secretary (Contract, art. VI (c).

Before further detailing the facts of the case, it is necessary to point out that the Park consists of Yosemite Valley plus a great amount of surrounding territory. The Valley has been the subject of statutory cessions different from the balance of the Park (hereafter called the Park as distinguished from the Valley). We therefore shall consider separately the problems presented by the two cessions.

### First. The Valley.

All of the area in question, including the entire territory comprising California and many western states, was acquired by the United States from Mexico in 1848 by the Treaty of Guadalupe Hidalgo.[2] California was admitted to statehood in 1850, the United States reserving its proprietary rights to the Valley and other unappropriated public lands.[3] Fort Leavenworth R. R. Co. v. Lowe, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264; 50 C.J. 887. The Congress gave the Valley to California in trust for public park and recreational purposes June 30, 1864,[4] thus relinquishing the previously reserved federal proprietary rights. In 1891 California enacted a law[5] reading: "The State * * * hereby cedes to the United States of America exclusive jurisdiction over such piece or parcel of land as may have been or may hereafter be ceded or conveyed to the United States, during the time the United States shall be or remain the owner thereof, for all purposes except the administration of the criminal laws of this State and the service of civil process therein."

By Act of March 3, 1905 (St.1905, p. 54), the California Legislature did: "hereby re-cede and re-grant unto the United States of America * * * the Yosemite Valley, * * * and the State of California does hereby relinquish unto the United States of America and resign the trusts created and granted" for public park purposes.

The statute further provided: "the same to be held for all time by the United States of America for public use, resort and recreation."

The United States by Act of June 11, 1906,[6] accepted the re-grant. There are no other statutes pertaining to the Valley, other than the California statute of 1919,

---

[2] 9 Stats. 922.
[3] 9 Stats. 452.
[4] 13 Stats. 325.

[5] St.Cal.1891, p. 262.
[6] 34 Stats. 831 (16 U.S.C.A. §§ 47–50 note).

hereinafter referred to, ceding jurisdiction to the federal government over the entire Park, which includes the Valley.

The problem now arises, do the recited facts show that exclusive jurisdiction of the Valley is vested in the United States? If they do, of course the state has no right to enforce its liquor laws therein.

We hold that the United States has exclusive jurisdiction of the Valley.

(1) In reference to the statutes granting the Valley to the state and regranting it to the United States, the defendants state at page 5 of their opening brief: "But neither of these acts granted territorial or governmental jurisdiction to the grantee and so may be disregarded."

We agree that the United States had only a proprietary interest in the Valley and that no jurisdiction passed from the United States to California or vice versa by virtue of the Acts of 1864 and 1905 alone. That much is conceded by plaintiff and by the United States. But we are inclined to heed these statutes, for they have a further significance.

The state regranting act of 1905 taken in conjunction with the California statute of 1891 generally ceding exclusive jurisdiction to the United States in all cases of transfer of land, establishes beyond a doubt that exclusive jurisdiction of the Valley is now in the United States.

■ (2) The state contends that regardless of what has been said, the state Legislature had no power to give up its taxing authority over the Valley. There is no federal constitutional prohibition against such a relinquishment. No state measure forbidding the transfer of jurisdiction has been cited to us. On the contrary, section 33 of the California Political Code provides for such transfers. What is relied upon is a California constitutional provision forbidding the giving away of the taxing power.[7] In Yellowstone, etc., Co. v. Gallatin County (C.C.A.9) 31 F.(2d) 644, a similar argument was examined and found to be without merit. Defendants have simply misapplied a general rule of state sovereignty to a situation in which the principal issue of territorial jurisdiction controls the right to tax. The Supreme Court, in Standard Oil Co. v. California, 291 U.S. 242, 54 S.Ct. 381, 78 L.Ed. 775, considered the effect of a cession of exclusive jurisdiction over the Presidio in San Francisco by the state to the United States. It was held that the state's right to tax also had been ceded.

■ (3) It is further argued on behalf of the state that the United States had no power under which it could obtain exclusive jurisdiction of the Valley when the Valley was not purchased with the consent of the state, and was not to be used for the "Erection of Forts, Magazines, Arsenals, Dock-Yards and other needful Buildings," as specified in article 1, § 8, Cl. 17, of the Federal Constitution. It is said in defendants' opening brief (p. 6) that the only manner mentioned in the Constitution for the United States to obtain exclusive jurisdiction of land by the acquisition thereof alone, is that set forth in the quoted clause. The proposition can be conceded, but is far from controlling. We may further concede the next statement made, that, when the federal government acquires land and jurisdiction thereof in any other way than that outlined in article 1, § 8, cl. 17 (in this case by cession), for the purposes mentioned in that clause, the state can make any reservation of jurisdiction it deems desirable short of imposing any conditions inconsistent with the use the United States desires to make of the territory. By the same token, the state can grant exclusive jurisdiction if it fails to impose conditions. As far as the Valley is concerned, that is exactly what occurred. It is sufficient to cite Standard Oil Co. v. California, supra, and Arlington Hotel Co. v. Fant, supra, to the effect that exclusive jurisdiction can be obtained by the United States upon cession of land by a state and without purchase by the United States with the consent of the state where the use is one set out in article 1, § 8, cl. 17.

It is thus seen that the only question involved is whether a state's cession of exclusive jurisdiction to the United States of land used for park or other purposes not enumerated in article 1, § 8, cl. 17, can be accepted by the latter. And defendants' argument in its essence is that such a procedure is impossible because park purposes are not mentioned in the quoted clause. Defendants' position is not sound. Moreover, it is unsupported by the authorities.

First, there is no constitutional prohibition against states ceding territory or jurisdiction to the United States, nor any

---

[7] Const. Cal. art. 13, § 6.

constitutional mandate placing the power to cede state territory in the federal government. Therefore such a power, being an inherent incident of sovereignty, must reside in the states, subject to the limitation, immaterial here, of denying a state the right to cede territory to foreign nations without consent of the Congress. Fort Leavenworth R. R. Co. v. Lowe, supra.

■ Second, the power to acquire jurisdiction by treaty, war, discovery, or cession, is an attribute of any sovereignty, whether it be a limited one or not. Jones v. U. S., 137 U.S. 202, at page 212, 11 S. Ct. 80, 34 L.Ed. 691.

Third, although the United States has no express power to accept even limited jurisdiction over ceded territory, yet defendants concede such power, and the courts and history sustain it. Benson v. U. S., 146 U.S. 325, 330, 13 S.Ct. 60, 36 L.Ed. 991. Nor can express constitutional permission to accept exclusive jurisdiction by means other than purchase with state consent be found; yet other methods have been sanctioned by practice and the Supreme Court. Standard Oil Co. v. California, supra; U. S. v. Unzeuta, 281 U.S. 138, 50 S.Ct. 284, 74 L.Ed. 761.

Fourth, in Chicago, etc., Ry. Co. v. McGlinn, 114 U.S. 542, at page 546, 5 S. Ct. 1005, 1006, 29 L.Ed. 270, we find the court saying: "it is competent for the legislature of a state to cede exclusive jurisdiction over places needed by the general government in the execution of its powers, * * * such jurisdiction necessarily ending when the places ceased to be used for those purposes."

■ We do not believe that it can be denied that the federal government is here exercising a proper governmental function. Under U. S. v. Butler, 297 U.S. 1, 56 S. Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, it could tax to raise money to buy parks under the "general welfare" clause.[8] Park and recreational facilities clearly provide for the general welfare. Likewise, it has never been hinted even remotely that the federal government did not have the power under article 4, § 3, cl. 2, to provide for the establishment of parks on land the United States had already acquired, whether by conquest, cession, or purchase. We therefore think that the federal government could accept jurisdiction under the Mc-

Glinn Case doctrine. Yellowstone Park Transportation Co. v. Gallatin County, supra; Rainier National Park Co. v. Martin (D.C.) 18 F.Supp. 481, lend further support to this view.

For the foregoing reasons it is concluded that the United States can and did accept exclusive jurisdiction over the Valley for park purposes.

■ (4) We turn then to the problem of whether or not the Twenty-First Amendment permits the state to tax liquor within the Valley. That amendment says: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

Defendants would have us hold that, so long as such land is "territorially" within the state, it is immaterial that such land is beyond the jurisdiction of the state, so far as this amendment is concerned. It is argued: " * * * the 21st amendment which deals solely with states, territories and possessions of the United States, can only relate to these places territorially and not politically. There is no suggestion in the 21st amendment there were to be areas within states over which such states could not control intoxicating liquors."

We are not convinced that the Twenty-First Amendment serves to extend to states a grant of jurisdiction over territories which formerly they could not control. There is nothing in the amendment to indicate such a purpose, any more than there is to indicate a granting of power to California to tax liquor sales and traffic in Oregon, which clearly would be absurd. Once a state relinquishes its jurisdiction over territory within its limits, its power over that particular land is gone absolutely. Standard Oil Co. v. California, supra. A state's right to tax liquor is a matter of power and jurisdiction. While the amendment may have increased the state's power to deal with the problem (see State Board of Equalization v. Young's Market Co., 299 U.S. 59, 57 S.Ct. 77, 81 L.Ed. 38), it did not increase its jurisdiction.

Defendants, by analogy to State Board of Equalization v. Young's Market Co., above, propose to interpret the Twenty-First Amendment in such a way as to modify normal federal powers of sovereignty in so far as liquor regulation is

---

8 Const.U.S. art. 1, § 8, cl. 1.

concerned. In the Young's Market Case it was held that a beer importer's license fee of $500 imposed by the state of California was not violative of the commerce clause (Const.U.S. art. 1, § 8, cl. 3) or the equal protection clause of the Fourteenth Amendment. The Supreme Court pointed out that, as the Twenty-First Amendment prohibited the "Importation" into a state of intoxicants in violation of the laws thereof, the commerce clause to that extent was necessarily and explicitly overruled; and that any classification permitted by the Twenty-First Amendment could not be violative of the Fourteenth.

We think it is straining the Young's Market Case too much to try to apply it to the present controversy where the facts and constitutional provisions involved are so widely divergent. No intent to relinquish the exclusive jurisdiction of the government to the states can fairly be deduced. Fort Leavenworth R. R. Co. v. Lowe, supra.

(5) The state having no jurisdiction within the Valley, it is immaterial whether the plaintiff is or is not a federal instrumentality—in either case the taxing power of California cannot reach it. Similarly, the cases in which the federal government has been permitted to tax state-owned and controlled liquor establishments, and which defendants contend justify a state tax on national liquor agencies, are not in point because the state has no jurisdiction whatsoever within the Valley. Thus South Carolina v. U. S., 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261, 4 Ann.Cas. 737, and like decisions have no bearing on the principal case.

### Second. The Park Outside of the Valley.

When in 1890 the United States set aside certain of its public lands to establish the Park,[9] the federal interest was merely proprietary. Jurisdiction of the lands comprising the Park was in the state, where it remained until 1919. In that year jurisdiction of the Park was offered to the national government, which had always retained the proprietary interest:[10] "Exclusive jurisdiction shall be and the same is hereby ceded to the United States over and within all of the territory which is now or may hereafter be included in * * * 'Yosemite National Park,' * * * sav-

ing, however, to the State of California the right to serve civil or criminal process within the limits of the aforesaid parks in suits or prosecutions for or on account of rights acquired, obligations incurred or crimes committed in said state outside of said parks; and saving further, to the said state the right to tax persons and corporations, their franchises and property on the lands included in said parks and the right to tax and collect license fees for fishing in said parks; and saving also to the persons residing in any of said parks now or hereafter the right to vote at all elections held within the county or counties in which said parks are situate; provided, however, that jurisdiction shall not vest until the United States through the proper officer notifies the State of California that they assume police jurisdiction over said parks."

By Act of June 2, 1920,[11] jurisdiction of the Park was assumed by the United States. The acceptance statute, referring to the provisions of the California act, said: "are hereby accepted and sole and exclusive jurisdiction is hereby assumed by the United States over such territory, saving, however, to the said State of California."

The reservations in the California statute were then set out verbatim. None of these statutes referred to or affected the Valley.

(1) What was said about the Valley, in relation to the power of California to relinquish its taxing authority over territory ceded to the United States, is equally applicable to the Park. Hence, any voluntary disposal of taxing power in the Park would be valid. We believe, likewise, that what has been said previously in regard to the Twenty-First Amendment is also conclusive as to the Park.

(2) Next we approach the problem of the power of the United States to accept jurisdiction of the Park for recreational purposes. Since we have held, in our study of the Valley, that exclusive jurisdiction can be obtained, it follows that any lesser quantum of jurisdiction can also be accepted. Fort Leavenworth R. R. Co. v. Lowe, supra. Under principles established in the Lowe Case and reiterated in Arlington Hotel Co. v. Fant, supra, the state, in ceding jurisdiction, may impose any conditions or withhold any amount of juris-

---

[9] 26 Stats. 650 (16 U.S.C.A. §§ 44, 45, 55, 61).

[10] St.Cal.1919, c. 51, p. 74.
[11] 41 Stat. 731, 16 U.S.C.A. § 57.

diction it desires so long as such reservations do not interfere with the use to which the United States wishes to put the property. In relation to the Park, the state of California had the right to reserve taxing power, not inconsistent with the federal governmental use.

■ (3) We now pass to a consideration of the taxing power reserved by the state in the act of 1919 granting jurisdiction of the Park to the United States, and confirmed by the United States in its acceptance statute of 1920.

Reference must be made to the case of Rainier National Park Co. v. Martin (D. C.Wash.3 judges), supra, in which similar statutes on the same subject gave rise to a problem closely resembling that involved in the case at bar. Despite the surface similarity of issues, we believe it is possible to distinguish the two cases on at least one important point.

In the Washington case a divided court held that the federal government had consented to the levy of an excise tax on the Rainier National Park Company, which was assumed to be a federal instrumentality. Since the clause which lead to this interpretation is the same as the saving clause in the federal acceptance of the California grant, it is important to investigate the reason which persuaded the court to hold as it did. Complete reliance was placed on the case of Mid-Northern Oil Co. v. Walker, 268 U.S. 45, 45 S.Ct. 440, 69 L. Ed. 841, which the majority of the court felt to be controlling. What does an examination of that case reveal? A license tax, measured by the total gross value of crude oil produced, was imposed by the state of Montana on a federal instrumentality engaged in mining. The tax was levied under a statute (30 U.S.C.A. § 189) which saved to the state "the right to levy and collect taxes upon improvements, output of mines, *or other rights,* property or assets of any lessee of the United States." (Italics ours.) Clearly the statute included in its broad language the very tax which the state was collecting. But should such a case control one in which the tax reservation says that the state saves "the right to tax persons and corporations, their franchises and property"? We believe that the answer is "no." The former broad clause covers a license tax; the lat-

ter does not. We think that the Washington interpretation of that clause is a strained one, and cannot be applied to the facts of this case.

But granting that the District Court was correct in its ruling, we wish to point out two distinctions between the Washington case and the principal case which we feel should sustain a different holding. In the first place, the California statute differs from the Washington measure of 1901 [12] in one important detail. In ceding Yosemite National Park to the federal government, California retained "the right to fix and collect license fees for fishing in said park." St.Cal.1919, p. 74. Such an express reservation of the right to collect license fees for one purpose is an indication that the right to collect license fees for all other purposes was renounced. The Washington statute, on the other hand, contains no such reservation.

In the second place, and of fundamental significance, we feel that the nature of the California license tax is sufficiently different from that of the Washington business tax to warrant a different ruling. The California enactment is chiefly regulatory in nature, and is confined to the liquor business; the Washington statute is a revenue measure which covers innumerable trades. While a revenue measure does not preclude the possibility of a clash between sovereignties, it does not invite one as a regulatory measure does. California has ceded the Park to the United States, which has agreed to police it. Now by reason of the Alcoholic Beverage Control Act, California evidently claims the retention of her police power. Such a claim is violative of the police jurisdiction placed in the hands of the national government, and is void.

Since the primary purpose of California's tax measure is the regulation of the intoxicating liquor business; since such regulation constitutes an exercise of the police power which is beyond the jurisdiction of the state, the measure cannot bestow upon California the power to collect license taxes from plaintiff for the importation and sale of liquors.

The motion to dismiss the complaint is denied; the motion for the issuance of a temporary injunction will be granted.

---

[12] Session Laws Wash.1901, c. 92, p. 192, § 1.