**UNITED STATES of America, Plaintiff,**

v.

**Carl E. BROWN, Defendant.**

**No. Cr. 5–76–10.**

United States District Court,
D. Minnesota,
Fifth Division.

Nov. 4, 1976.

Robert G. Renner, U. S. Atty., Minneapolis, Minn., for plaintiff.

William W. Essling, St. Paul, Minn., for defendant.

Warren Spannaus, Atty. Gen., St. Paul, Minn., for the State of Minnesota, as amicus curiae, by Philip J. Olfelt, Asst. Atty. Gen., and Steven G. Thorne, Sp. Asst. Atty., Gen., Dept. of Natural Resources, St. Paul, Minn.

## MEMORANDUM AND ORDER

MILES W. LORD, District Judge.

### I. *Introduction and Facts*

■ From a judgment of conviction by a United States Magistrate,* Carl E. Brown has taken a timely appeal to this Court. Rule 8(a) Fed.R.P. for the Trial of Minor Offenses Before United States Magistrates. The review by this Court is the same as an appeal from a judgment of a district court to a court of appeals. Rule 8(d), *supra.*

Because this is a case testing the jurisdiction of the United States to exercise its authority over the water areas within the boundaries of Voyageurs National Park, there is no dispute concerning the facts which gave rise to this action. On October 7, 1975, Carl E. Brown went duck hunting on a portion of Rainy Lake known as Black Bay in Township 70 North, Range 22 West, Section 12 or 13. His boat was afloat on waters situated within the boundaries of Voyageurs National Park. Specifically, Mr. Brown was cited for violations of National Park Service regulations prohibiting the possession of a loaded firearm and the hunting of wildlife in national parkways. 36 C.F.R. §§ 2.11 and 2.32. Mr. Brown concedes and the Magistrate found that he was hunting ducks and, in fact, shot at a passing duck while the Rangers were issuing a citation to him.

The Magistrate found that the United States, as delegated to the Secretary of the Department of Interior, has jurisdiction over the waters within the Park's boundaries and may enforce National Park Service regulations promulgated under that jurisdictional authority. As a result, Carl E. Brown was found guilty of violating the above referenced sections for which the citation was issued. He was sentenced to pay a fine of $50.00 for violating 36 C.F.R. § 2.11 and $100.00 for violating 36 C.F.R. § 2.32.

At his preliminary hearing, Mr. Brown moved the Magistrate's Court for an order dismissing the action because the United States lacked jurisdiction over the waters situated within the Park. The Magistrate, in a Memorandum accompanying his order denying Brown's motion, indicated the Minnesota Legislature had acquiesced in the jurisdictional authority of the United States over the waters although the United States had not acquired any ownership interest in the beds or surface areas. The Magistrate found that the State was an active participant in the creation of the park and that the activities of the State in passing enabling legislation and otherwise encouraging the development of the Park " . . . can only be consistent with a finding that it intended to cede jurisdiction of the lands within the boundaries of the proposed park to the United States." Magistrate's Memorandum, p. 3, April 26, 1976.

On August 19, 1976, the Court heard oral argument on the issues raised on this appeal. At that time, the State of Minnesota was allowed to participate as amicus curiae because of its avowed sovereign jurisdiction to regulate exclusively the public navigable waters within Voyageurs National Park. A schedule was established for the submission of briefs and the matter was taken under advisement on September 25, 1976.

For the reasons stated below, the Court concludes that the United States does have jurisdiction to regulate the waters in Voyageurs National Park to the extent it is necessary to protect its public lands and to effectuate the purpose for which those lands were acquired and therefore may enforce the regulations prohibiting hunting and the possession of loaded firearms within the park boundaries.

### II. *Law*

The United States argues that it has jurisdiction to regulate the waters within Voyageurs National Park under various constitutional powers including the Property Clause, the Commerce Clause and the treaty power. It further argues that the State of Minnesota offered jurisdiction, subsequently accepted and perfected by the State, in legislation responding to the na-

---

* Steven A. Nelson, International Falls, Minnesota.

tional act. The State of Minnesota, with whom Carl Brown concurs, disagrees. It takes the position that the treaty power and Commerce Clause have no relationship to legislation establishing this or any national park, that the only constitutional basis for such acts is the Property Clause. Further, Minnesota maintains it never ceded jurisdiction over the waters within the Park's boundaries. As a result, the United States cannot exercise any authority over those waters. Simply stated, Minnesota takes the position that without acquisition of water territory in the Park or absent a cession of jurisdiction from the State, the United States is powerless to extend the jurisdiction of the National Park Service over the waters which are held in trust by the State for the benefit of the citizens of Minnesota.

■ This Court agrees that Minnesota has not ceded jurisdiction over the waters to the United States. The responding legislation only grants concurrent jurisdiction to the United States over the lands acquired for park purposes by consent of the State. Minn.Stat. § 84B.06 (1971). Therefore, this is not a case where a specific grant of jurisdiction, exclusive or otherwise, has been made over territory not acquired by the United States through purchase, donation or condemnation thereby enabling the United States to enforce its regulations over unowned property. *Petersen v. United States,* 191 F.2d 154 (9th Cir. 1951).

■ It is also not legally sufficient to say that because Minnesota concurred with the United States in the purpose for establishing the park it intended to cede jurisdiction over the waters to the national sovereign. Minn.Stat. § 84B.01, subds. 2 and 3 (1971); 16 U.S.C. § 160. Cession statutes are to be strictly construed and it will not be presumed, in the absence of a clearly expressed intent, that a state has relinquished its sovereignty. *Six Cos. v. De Vinney,* 2 F.Supp. 693, 697 (D.Nev.1933). Assuming an intent from the purpose clause of the Minnesota legislation assumes too much when read with the limited grant of cession in Section 84B.06. Furthermore, this Court cannot assume that retention by

the State of jurisdiction over the waters in the Park would be or is incompatible with the purpose of preserving " . . . the outstanding scenery, geologic conditions, and waterway system which constituted a part of the historic route of the voyageurs . . . ." Minn.Stat. § 84B.01, subd. 2 (1971). However, this is not to say that the United States lacks authority over the waters absent a specific cession of jurisdiction by the State. The Court merely finds that Minnesota has not ceded jurisdiction to the United States over the waters by a specific legislative act.

The posture of this case is not unique to the long and often difficult history which has characterized the development of Voyageurs National Park. It is only the most recent occurrence in a long series of events which has pitted local sportsmen against the policies of the National Park Service.

When Senate bill 1962 was introduced and analyzed by the Senate Committee on Interior and Insular Affairs, it contained specific provisions allowing waterfowl hunting and trapping in accordance with the applicable state laws. 1970 U.S.Code Cong. and Adm.News pp. 5965, 5972. However, both the Secretary of the Interior and the Secretary of Agriculture objected to such provisions as inconsistent with longstanding objectives and purposes for which national parks are established.

Walter J. Hickel, Secretary of the Interior, stated:

"If an area is to be accorded the dignity and statute [sic] of designation as a national park, then many ordinary recreational and commercial influences, including hunting and trapping, must be subordinated to the larger achievement of preservation.

While other avenues of national recognition can accommodate such uses, such as a national recreation area, we cannot support the establishment of a national park which includes recreational or commercial hunting and trapping."

1970 U.S.Code Cong. and Adm.News, *supra,* at p. 5975.

The situation was similar in the House of Representatives. Whether hunting and trapping would be permitted within a National Park was a focal issue and one which received a thorough airing. The State of Minnesota was made well aware of the intentions of the Subcommittee during the testimony of Governor Harold LeVander.

Congressman Roy A. Taylor, Chairman of the Subcommittee on National Parks and Recreation, told the Governor:

"It is out. We are either not going to have a park or we are not [sic] going to have hunting and fishing. It is just that simple. I mean hunting and commercial fishing are out. Sport fishing, of course, is permitted in national park areas."

*Hearings Before the Subcommittee on National Parks and Recreation of the Committee on Interior and Insular Affairs, House of Representatives on H. R. 10482, 91st Cong., 2d Sess., Serial No. 91–10, p. 359 (1970).*

Further along in the proceedings, Congressman Morris Udall of Arizona, presented a summation of the Subcommittee's feelings regarding Minnesota's proposal for hunting in Voyageurs National Park.

"It should be very clear to you by now—it is certainly clear to me, based on my judgment of this committee—we certainly are not going to have a national park with hunting. This committee is not going to allow it and this dream of a couple of generations for a Voyageurs Park we have in our grasp this year but it is going to go down the drain if hunting is insisted upon . . .. You can have one of two things this year with regard to Voyageurs. You can have a national park, or we can pass a bill making this a national recreational area."

*Hearings, supra,* at pp. 366–367.

From the House hearings and the comments from the Departments of Interior and Agriculture, the intent of Congress and the policies of the National Park Service should have been clear to Minnesota. If not, the policies relevant to hunting were manifest when the act creating the park was passed in final form.

The bills in both the House and Senate were amended to delete any mention of hunting privileges and subsequently passed as Public Law 91–661. Under the Act, the Secretary is only required to permit recreational fishing within the Park's boundaries in accordance with applicable laws of the United States and of the State of Minnesota. 16 U.S.C. § 160g. In addition, he may, when planning the development of the Park, include provisions for winter sports, the use of snowmobiles, of seaplanes, and the use of all types of watercraft. 16 U.S.C. § 160h. Aside from these specific provisions, the Act provides only that the Secretary is to administer the Park in accordance with 16 U.S.C. §§ 1, 2–4. Section 3 of that title allows the Secretary to promulgate necessary rules and regulations for the use and management of the parks consistent with the purpose of national parks, which include the conservation of scenery, natural and historical objects, and wildlife. 16 U.S.C. § 1. The regulations at issue here were promulgated under that authority. *See,* 36 C.F.R. §§ 2.11, 2.32.

■ As this Court found above, Minnesota, although it lost the battle with Congress in its effort to obtain hunting rights within the boundaries of the park, was careful not to grant blanket legislative jurisdiction over the entire park area to the United States. The State merely granted concurrent jurisdiction over the lands acquired by the Federal Government. The distinction between land and water areas within Voyageurs National Park is no inconsequential difference. There are approximately 139,000 acres of land within the park's boundaries and 80,000 acres of water. Therefore, whether or not hunting is allowed within this national park becomes a matter of immeasurable importance to both sides. Minnesota is concerned about the potential loss of a substantial amount of water area representing traditionally good hunting zones. On the other hand, the United States and the National Park Service is equally concerned about preservation of the park area and protection of these areas from normal commercial and recreational activities, such as hunting

and trapping. However, absent a cession of jurisdiction by the State over the water areas, the United States does not acquire derivative legislative powers to exercise its authority over them. *Halpert v. Udall,* 231 F.Supp. 574, 575 (S.D.Fla.1964); *Collins v. Yosemite National Park Curry Co.,* 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502 (1937); U.S.Const., art. 1, § 8, cl. 17.

■ But while the United States cannot acquire exclusive or partial derivative jurisdiction over areas within a state without the state's consent or cession, the presence or absence of such jurisdiction has nothing to do with its powers under the Property Clause. *Kleppe v. State of New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976). In *Kleppe,* the Supreme Court noted that absent consent or cession a state retains jurisdiction even over federal lands subject to federal power under the Property Clause to enact legislation respecting those lands. When Congress acts under that clause, the federal legislation overrides conflicting state laws under the Supremacy Clause. *Kleppe v. State of New Mexico, supra,* at 541, 96 S.Ct. 2285.

The Property Clause of the Constitution provides that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States". U.S.Const., art. IV, § 3, cl. 2. It has been recognized that this clause may be the basis for the establishment of parks on land acquired by the United States. *Yosemite Park & Curry Co. v. Collins,* 20 F.Supp. 1009 (N.D.Cal.1937).

■ In the federal legislation establishing Voyageurs National Park, the Secretary of the Interior is given the authority to administer the park according to the provisions of 16 U.S.C. §§ 1, 2–4. 16 U.S.C. § 160f. Section 3 of Title 16 gives the Secretary authority to promulgate rules and regulations "as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service . . .." In making rules and regulations for national parks which are proper for their use and management, the Secretary is guided by the "fundamental purpose" of national parks which is to ". . . conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 16 U.S.C. § 1. This purpose is consistent with the specific purpose given for the establishment of Voyageurs National Park. 16 U.S.C. § 160. This administrative authority is indeed very broad and necessarily includes the power to promulgate regulations prohibiting activity which may be detrimental to the use of public land within the park. *New Mexico State Commission v. Udall,* 410 F.2d 1197, 1201 (10th Cir. 1969).

■ Under his authority to regulate the use of park lands, the Secretary has promulgated the regulations which prohibit possessing loaded firearms and hunting within park areas in order to preserve and protect park areas from what otherwise may be considered normal or recreational uses. 36 C.F.R. §§ 2.11 and 2.32. By doing so, he has deemed such activity to be an improper use of park property. And under the Property Clause, Congress or its delegates have broad power to regulate public property. In this Court's view, that power certainly includes the authority to prohibit hunting and the possession of loaded firearms on public land within a national park.

■ This determination, however, does not reach the issue before the Court in this case. The question still remains whether the United States, acting through the Secretary of the Interior and the National Park Service, has the power under the Property Clause to enforce these regulations within the park's boundaries but on territory over which it has not acquired ownership. Under the facts of this case and considering the purpose for which the public lands were acquired, the Court must conclude that hunting may be prohibited on the public waters within Voyageurs National Park.

In *Camfield v. United States,* 167 U.S. 518, 17 S.Ct. 864, 42 L.Ed. 260 (1897), the Supreme Court extended Congressional power under the Property Clause to situations where a certain use of private land interferes with the uses for which the public land was acquired. At issue in that case was a statute which prohibited the enclosure of public lands when no claim of title or property right had been asserted by the party fencing in the public territory. The court intimated that the purpose of the statute was to promote or, at least, allow settlement of unowned lands in Colorado. The Court then noted that Congress passed the statute in response to persons who were building fences on private land but by so doing were effectively enclosing the public land and thereby preventing intending settlers access to lands which the Government wished to be settled. The Court held:

"Considering the obvious purposes of this structure, and the necessities of preventing the enclosure of public lands, we think the fence is clearly a nuisance, and that it is within the constitutional power of Congress to order its abatement, notwithstanding such action may involve an entry upon the lands of a private individual. The general Government doubtless has a power over its own property analogous to the police power of the several states, and the extent to which it may go in the exercise of such power is measured by the exigencies of the particular case. If it be found to be necessary for the protection of the public, or of intending settlers, to forbid all enclosures of public lands, the Government may do so, though the alternate sections of private lands are thereby rendered less available for pasturage."

*Id.,* at 525, 17 S.Ct. at 867. Although not addressing the issue presented in *Camfield,* the Supreme Court recently stated:

" . . . *Camfield* holds that the Property Clause is broad enough to permit federal regulation of fences built on private land adjoining public land when the regulation is for the protection of the federal property. *Camfield* contains no limitation on Congress' power over conduct on its own property; its sole message is that the power granted by the Property Clause is broad enough to reach beyond territorial limits."

*Kleppe v. State of New Mexico, supra,* 426 U.S. at 538, 96 S.Ct. at 2291.

■ The reach of the Property Clause extends to prohibiting interference with uses of public lands sanctioned by Congress. In *McKelvey v. United States,* 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301 (1922), the High Court said:

"It is firmly settled that Congress may prescribe rules respecting the use of the public lands. It may sanction some uses and prohibit others, and may forbid interference with such as are sanctioned." *Id.,* at 359, 43 S.Ct. at 135.

Here, the regulations prohibiting hunting and the possession of loaded firearms have been deemed necessary in order to preserve the public lands and wildlife within the park. Because duck hunting usually occurs within close proximity of adjacent land areas, such activity on adjoining water areas would substantially interfere with the use of these public lands. The potential for invasion of adjacent public lands contrary to the purpose for which they were acquired by the United States is great indeed. Ducks may be shot over the public lands and pellets from discharging guns may rain upon the public territory and, not inconceivably, cause injury to other park users. Additionally, the infusion of a hunting element into the park areas could cause disruption of the wildlife patterns in the park contrary to the purpose of unimpaired preservation. During the hunting season, normal duck migration patterns may be changed and other wildlife may be scattered in an abnormal manner within the park. Finally, the presence of a potentially great number of additional people during a hunting season may cause a substantially greater burden on the adjacent park land than what was originally envisioned. Only in theory could duck hunting be done entirely on the waters. In reality, the adjacent public lands would be exposed to depredation and

uses which are prohibited on public land within national parks.

Carl Brown was cited for certain violations while on public waters held by the State of Minnesota for the benefit of its citizens. However, his location on the Black Bay waters was immediately adjacent to public lands within the park. Although his location has not been specifically ascertained, the Court finds he was on waters within Section 12 or 13 of Township 70, Range 22 West. In either section, the surrounding land areas have been acquired by the United States for park purposes. Because hunting is prohibited on these lands, there is no doubt in this Court's mind that duck hunting on the contiguous water areas represents a significant interference with the normal use of the public park lands and, as such, is a nuisance which the Park Service may prohibit in order to protect these lands and preserve them according to the purposes for which they were acquired. *Camfield v. United States, supra,* at 525, 17 S.Ct. 864.

■ Where the State's laws conflict with the hunting and firearms regulations of the National Park Service, promulgated pursuant to authority originally from the Property Clause, the local laws must recede. *Kleppe v. State of New Mexico, supra,* 426 U.S. at 541, 96 S.Ct. 2285. Therefore, the regulations prohibiting hunting and loaded firearms within national parks may be enforced in this case.

■ The fact that the National Park Service regulations prohibiting hunting and loaded firearms within the park do not apply to privately owned land within the park does not affect the authority of the United States to regulate hunting on contiguous public waters. *See,* 36 C.F.R. § 1.1(b). The Property Clause gives Congress authority to regulate the waters for the protection of the park lands and to prevent interference with the purpose for which the lands were acquired. For policy reasons unknown at this time, the Secretary has decided not to regulate these activities on private lands. Declining to exercise valid authority is distinguishable from the power which is the basis of the regulatory authority itself. If the Property Clause limited governmental authority to only those lands it actually acquired, as the State of Minnesota argues, the provision which makes the regulations inapplicable to privately owned land would be unnecessary. In fact, the *Camfield* decision and its progeny stand for a contrary view and one which provides an explanation for the necessity of including a specific exemption for private lands. *See also, McKelvey v. United States,* 260 U.S. 353, 43 S.Ct. 132, 67 L.Ed. 301 (1922); *United States v. Alford,* 274 U.S. 264, 47 S.Ct. 597, 71 L.Ed. 1040 (1927); *Hunt v. United States,* 278 U.S. 96, 49 S.Ct. 38, 73 L.Ed. 200 (1928). The exemption for private lands, in any case, does not apply to public navigable waters.

This Court has learned that of the approximately 139,000 acres within the park's boundaries, only about 26,000 acres remain in private hands. The Park Service intends to acquire these remaining acres by the end of fiscal year 1978 and therefore the exemption for private lands will then have no meaningful effect within Voyageurs National Park.

■ The Court, however, specifically declines to decide whether all the regulations of the Park Service which are or may be applicable to water areas not owned by the United States, but which are within the park's boundaries may be enforced under the authority of the Property Clause. It is only where, as here, certain commercial or recreational activities significantly interfere with the use of the park and the purpose for which it was established that this Court would agree the United States has authority to regulate the activities on territory over which it has neither acquired ownership nor a grant of jurisdiction from the State. The significant interference found here involves the potential threat of depredation to the public lands and injury to park uses from activity expressly prohibited on public parklands.

The United States, as noted earlier, has argued alternative grounds upon which it

may have jurisdiction over unowned water areas within the park. The Court does not believe it necessary in light of its holding today, or appropriate under the facts presented, to reach the merits of those arguments.

For the reasons stated, the judgment of the Magistrate is hereby affirmed but modified to conform with this opinion.

IT IS SO ORDERED.