*565 STEPHEN A. HIGGINSON, Circuit Judge,
dissenting:
“In all failures, the beginning is certainly the half of the whole.” George Eliot, Middlemarch (1874). The failure I apprehend is incremental reassignment of federal judicial power. From the first Judiciary Act, magistrates (later “commissioners,” presently “magistrate judges”) have assisted federal district judges, the primary courts of original jurisdiction in the federal system.[1] As assistants, the federal magistracy is an Article III adjunct body — joining in aid, indispensably and even magisterially — but always part of, and with delimited Article III jurisdiction and authority. That is true statutorily,[2] historically,[3] and doetrinally,[4] and is *566 so constitutionally. U.S. Const, art. Ill, § 1 (“The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts as the Congress may, from time to time, ordain and establish. The judges, both of the Supreme and inferior courts, shall hold their offices during good behaviour; and shall, at stated times, receive for their services, a compensation, which shall not be diminished during their continuance in office.”). For that reason, I do not agree that our federal magistracy is an Article I court system with Palmore equivalence to *567 congressional court systems over federal territories and the District of Columbia, available constitutionally, as the majority contemplates, to exercise federal judicial power outside of Article III, and regardless of party consent.[5]
Instead, I would reiterate that the federal magistracy has been a longstanding adjunct body to Article III “constitutional courts,” different in kind from Article I “legislative courts,” to use the dime-tested distinction set forth by Chief Justice Marshall in American Insurance Co. v. 356 Bales of Cotton, 26 U.S. 511, 512, 1 Pet. 511, 7 L.Ed. 242 (1828). At least as to constitutional courts whose life tenure and protected salaries give Article III its structural independence, judicial power flows through circuity that is a closed loop. See James E. Pfander, Article I Tribunals, Article III Courts, and the Judicial Power of the United States, 118 Harv. L. Rev. 643, 672 (2004) (“Article III creates an independent judicial department with a single Supreme Court to which all other federal courts, if any, must remain inferior. The familiar pyramidal shape of the judicial department flows from the combined requirements of unity, supremacy, and inferiority, and precludes Congress from establishing an independent set of courts invested with a portion of the judicial power and free from ultimate oversight in the Supreme Court.”).
Notably, Congress has the power not only to make “all laws which' shall be necessary and proper for carrying into execution [its own] foregoing powers” (hence laws establishing bankruptcy, immigration, and military tribunals, whose adjudicative powers exist alongside constitutional courts, often reviewed by them), but also, significantly, “all laws which shall be necessary and proper for carrying into execution ... all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof.” U.S. Const. art. I, § 8, cl. 18. Constitutional courts are comprised of “principal officers,” and our federal magistracy assisting them is proper congressional objective to effectuate “other powers” reposed in Article III. See McCulloch v. Maryland, 17 U.S. 316, 4 Wheat. 316, 4 L.Ed. 579 (1819).
Finding constitutional birthright in Article I, Section 8, Clause 18’s “other powers” phrase — instead of Clause 17’s Seat of Government Clause or its Enclave Clause enhancement of Article I powers — enhances Article III courts’ discretion to refer matters to the federal magistracy for preliminary review and a recommended decision. See Mathews v. Weber, 423 U.S. 261, 270-71, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976). Indeed, as Congress has revised and expanded matters that may be so referred, the Supreme Court repeatedly has tested each subsequent delegation, when there is no consent, according to one constant principle, namely, that case-dispositive matters may be handled by magistrate judges provided that Article III district courts retain full and ultimate authority “to make an informed, final determination” of the case. See United States v. Raddatz, 447 U.S. 667, 682-83, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).[6]
*568 Section 3401(b)’s diversion of core federal judicial power to try an accused over objection through conviction, and then also to sentence a convicted defendant to prison, subject only to appeals to district judges now reviewing with identical, often considerable, deference given by circuit courts, infringes the “total control and jurisdiction” constitutional courts must exercise over federal criminal trials. Raddatz, 447 U.S. at 681-83, 100 S.Ct. 2406. As the majority decides, the Article III adjunct has become the Article I judge, at least in any relevant constitutional adjudicatory sense. There may be efficiencies to this arrangement, though the legislative history offers no showing that criminal trials are overburdening constitutional courts. Regardless, the Supreme Court has not shown solicitude to workload as a basis to pass off the essential attributes of power assigned to other branches of our government. See Clinton v. City of New York, 524 U.S. 417, 447-49, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998); I.N.S. v. Chadha, 462 U.S. 919, 944-59, 103 S.Ct. 2764, 77 *569 L.Ed.2d 317 (1983).[7] Finally, the implications of the majority opinion’s reliance on half-century old legislative court precedent, instead of the Supreme Court’s more recent, half-dozen cases calibrating Article III judicial power referred to magistrate judges, are far-reaching, acknowledging that Congress could expand an Article I magistracy alongside and independent of Article III federal district courts to try federal criminal felony (even capital) cases that might arise in a federal enclave.[8] *570 Federal enclaves are neither few nor small, and no limiting principle is offered other than that presently Congress has refrained from extending the orbit of first-instance criminal trial adjudication to the nearly three thousand other offenses set forth in its federal criminal code. See Geras v. Lafayette Display Fixtures, Inc., 742 F.2d 1037, 1054 (7th Cir.1984) (Posner, J., dissenting) (“Maybe section 636(c) [conferring civil jurisdiction on magistrate judges with parties’ consent] is a small violation of the Constitution. But the time to deal with this small violation is now,’ before it sends down roots.... It will be harder to enforce the Constitution against the excesses of the magistrate system when magistrates try 10 or 20 or 50 percent of the nation’s federal trials — when ... section 636(c) is indispensable to coping with the federal judicial workload- — ■ than it is today.”).
It is said that a well-built house requires but little repairs. Article III federal district judges are not over-burdened in their most essential judicial function, trying federal criminal cases. Without consent, persons accused of federal offenses should not lose their liberty except after trial in a constitutional court, unless an Article III judge-reserves “the ultimate decisionmaking authority.” Marathon, 458 U.S. at 79, 102 S.Ct. 2858 (citing Raddatz, 447 U.S. at 682, 100 S.Ct. 2406).

. See Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91 ("[F]or any crime or offence against the United States, the offender may, by any justice or judge of the United States, or by any justice of the peace, or other magistrate of any of the United States where he may be found agreeably to the usual mode of process against offenders in such state, and at the expense of the United States, be arrested, and imprisoned or bailed, as the case may be, for trial before such court of the United States as by this act has cognizance of the offence.”); Act of March 2, 1793, ch. 22, § 4, 1 Stat. 333, 334 ("[B]ail for appearance in any court of the United States ... may be taken by any judge of the United States ... and by any person having authority from a circuit court, or the district courts of Maine or Kentucky to take bail; which authority ... may [be] give[n] to one or more discreet persons learned in the law....”); Act of March 1, 1817, ch. 30, 3 Stat. 350 ("[T]he commissioners who now are, or hereafter may be, appointed by virtue of the act, entitled 'An act for the more convenient taking of affidavits and bail in civil causes, depending in the courts of the United States,’ are hereby au-. thorized to take affidavits and bail in civil causes, to be used in the several district courts of the United States....”).

. 28 U.S.C. § 636(b)(4) ("Each district court shall establish rules pursuant to which the magistrate judges shall discharge their duties.”); id. § 636(b)(1)(B) ("[A] judge may also designate a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court....”); id. § 636(c)(4) ("The court may, for good cause shown on its own motion, or under extraordinary circumstances shown by any party, vacate a reference of a civil matter to a magistrate judge under this subsection.”). Compare 18 U.S.C. § 3401(a) ("When specially designated to exercise such jurisdiction by the district court or courts he serves, any United States magistrate judge shall have jurisdiction to try persons accused of, and sentence persons convicted of, misdemeanors committed within that judicial district.”), with id. § 3401(b) ("Any person charged with a misdemeanor, other than a petty offense may elect, however, to be tried before a district judge for the district in which the offense was committed.” (emphasis added)).

.Indeed, no congressional intent exists until 1996 to support as a constitutionally delegable responsibility the right to fully try federal criminal misdemeanor offenses over a defendant’s objection. And no congressional intent exists, ever, at all, for using the Enclave Clause of Article I as authority to so empower magistrate judges. See, e.g., To Abolish the Office of United States Commissioner, to Establish in Place Thereof Within the Judicial Branch of the Government the Office of the United States Magistrate, and for Other Purposes: Hearing on S. 945, H.R. 5502, H.R. 8277, H.R. 8520, H.R. 8932, H.R. 9970, and H.R. 10841 Before the Subcomm. No. 4 of the H. Comm. on the Judiciary, 90th Cong. 62 (1968) (statement of Warren Christopher, Deputy Att'y Gen. of the United States) ("[T]he performance of judicial functions by the magistrates would be entirely under the control of Article III judges. In fact, the magistrates themselves would function within the judicial branch, as satellite tribunals to the Article III courts.”); H.R. Rep. No. 94-1609, at 4 (1976) ("When the Congress enacted the Magistrates Act in 1968 ... it created a system of full-time and part-time judicial officers who would perform various judicial duties under the 'supervision of the district courts in order to assist the judges of these courts in handling an ever-increasing caseload.”); id. at 11 (“The judge is given the widest discretion to 'accept, reject or modify' the findings and recommendation proposed *566 by the magistrate, including the power to remand with instructions. Thus, it will be seen that under subparagraph (B) and (C) the ultimate adjudicatory power over dispositive motions, habeas corpus, prisoner petitions and the like is exercised by a judge of the court after receiving assistance from and the recommendation of the magistrate.''); see also Linda J. Silberman, Masters and Magistrates Part II: The American Analogue, 50 N.Y.U. L. Rev. 1297, 1303-05 (1975) (explaining that the creation of magistrates was prompted by "the need for assistance to judges” and that "[t]he jurisdiction being exercised [by magistrate judges] is clearly that of the article III federal district court, and the article III judge directly controls the magistrate’s powers” (footnote omitted)); Admin. Office of the U.S. Courts, A Guide to the Legislative History of the Federal Magistrate Judges System 21 (1995) ("The Senate report [regarding the 1976 Amendments to the Federal Magistrates Act] noted that without the assistance furnished by magistrates in handling additional duties for the court, district judges would have to devote a 'substantial' portion of their time to various procedural matters rather than to trying cases.”).

. See, e.g., Wingo v. Wedding, 418 U.S. 461, 469-70, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974) (finding that the Federal Magistrates Act did not authorize magistrates to hold habeas corpus evidentiary hearings and explaining that "although the Act gives district judges broad authority to assign a wide range of duties to magistrates, Congress carefully circumscribed the permissible scope of assignment to only 'such additional duties as are not inconsistent with the Constitution and laws of the United States’" (quoting 28 U.S.C. § 636(b))); United States v. Raddatz, 447 U.S. 667, 681, 683, 100 S.Ct. 2406, 65 L.Ed.2d 424.(1980) (holding that the district court's referral of a motion to suppress to a magistrate did not violate Article III "so long as the ultimate decision is made by the district court,” and explaining that "Congress was alert to Art. Ill values concerning the vesting of decisionmaking power in magistrates. Accordingly, Congress made clear that the district court has plenary discretion whether to authorize a magistrate to hold an evidentiary hearing and that the magistrate acts subsidiary to and only in aid of the district court. Thereafter, the entire process takes place under the district court's total control and jurisdiction.”); Gomez v. United States, 490 U.S. 858, 871-72, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (finding that the Federal Magistrates Act's "additional duties” clause did not permit magistrates to conduct jury selection in felony trials without consent and explaining that "the carefully defined grant of authority to conduct trials of civil matters and of minor criminal cases [subject to special assignment, consent of the parties, and judicial review] should be construed as an implicit withholding of authority to preside at a felony trial. The legislative history, with its repeated statements that magistrates should handle subsidiary matters to enable district judges to concentrate on trying cases, and its assurance that magistrates' adjudicatory jurisdiction had been circumscribed in the interests of policy as well as constitutional constraints, confirms this inference.” (footnotes omitted)); Peretz v. United States, 501 U.S. 923, 937, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) (distinguishing Gomez on the basis of consent and holding that when a defendant consents, the magistrate has jurisdiction to perform jury selection in a felony trial, finding no Article III structural protections implicated where the district court maintains "total control and jurisdiction” (internal citation and quotation marks omitted)). See generally Crowell v. Benson, 285 U.S. 22, 61-65, 52 S.Ct. 285, 76 L.Ed. 598 (1932) (approving statutory regime that allowed the United States Employees’ Compensation Commission to make initial fact-finding, but requiring substantial oversight by Article III judges, who must decide "fundamental or jurisdictional facts” de novo).

. Supreme Court's precedent, see, e.g. Baldwin v. New York, 399 U.S. 66, 68 & n. 5, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970), instructs that persons accused of petty offenses, not considered "crimes” at common law, have no due process right to be tried by a jury of their peers. On that point, I concur.

. Well-developed non-delegation caselaw has been applied to the distinctive Article III role of our federal magistracy over half a dozen times by the Supreme Court, see, e.g., supra note 4, as well as by our court. See, e.g., United States v. Johnston, 258 F.3d 361 (5th Cir.2001) (holding that a consensual delegation of the final judgment in a federal prison *568 er's motion to vacate conviction or sentence to a magistrate judge violated the Constitution); Hill v. City of Seven Points, 230 F.3d 167 (5th Cir.2000) (holding that a post-consent reference order signed by the district judge was required to vest authority in a magistrate judge for disposition of a summary judgment motion); Puryear v. Ede’s Ltd., 731 F.2d 1153 (5th Cir.1984) (holding that referrals of civil matters to magistrates pursuant to 28 U.S.C. § 636(c) are constitutional "[f]or essentially the reasons stated by our sister circuits”). Yet the majority opinion gives this caselaw of ours no reference, jumping back over half a century of doctrinal turbulence applicable to legislative courts to the Supreme Court’s most permissive precedent in Palmore v. United States, 411 U.S. 389, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973). Even making that span, the majority must also use leapfrog logic connecting Palmore, a case addressing Congress’s creation of an “entirely new court system” in the District of Columbia "with functions essentially similar to those of the local courts found in the 50 States of the Union,” 411 U.S. at 409, 93 S.Ct. 1670, to a decision a decade earlier, Paul v. United States, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963), a case addressing California’s attempt to enforce price regulations on milk sold at military installations. Second, the majority cites broadly to Northern Pipeline Construction Co. v. Marathon Pipe Line Co., 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (declaring unconstitutional Congress's broad grant of jurisdiction to bankruptcy judges over all civil proceedings arising under, or arising in or related to cases under, Title 11), yet only determinatively to its dissent for the proposition that there is no principled difference between the work that Congress may assign to Article I courts and that which must be assigned, constitutionally, to Article III courts. Indeed, the Court in Marathon (1) explicitly disclaims the "ad hoc balancing” approach implicit in the majority's reasoning — that "petty offenses” are less significant, id. at 70 n. 25, 102 S.Ct. 2858; (2) highlights that Palmore is limited to the "unique” District of Columbia and "territories outside the States” which are "specialized areas having particularized needs,” id. at 75-76, 102 S.Ct. 2858 (internal quotation marks omitted); (3) reinforces Congress’s power to create Article III adjuncts — performing "limited adjudicatory functions” and operating within Article III — restrained by the requirement that Article III courts retain "the essential attributes of the judicial power,” id. at 77 n. 29, 102 S.Ct. 2858 (quoting Crowell, 285 U.S. at 51, 52 S.Ct. 285); and (4) crucially, in the Court’s only discussion of the Federal Magistrates Act, the Court vindicates Raddatz s principle that "the ultimate decision [would be] made by the district court,” id. at 79-83 & n. 33, 102 S.Ct. 2858 (quoting Raddatz, 447 U.S. at 683, 100 S.Ct. 2406). Finally, the majority overlooks subsequent, limiting legislative court caselaw, above all Commodity Futures Trading Comm'n v. Schor, Ali U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986), whose multifaceted test likely is not met by full criminal trial authority exercised here, even if magistrate judges were, as I strongly contend they. are not, Article I legislative courts. See generally Judith Resnik, "Uncle Sam Modernizes His Justice”: Inventing the Federal District Courts of the Twentieth Century for the District of Columbia and the Nation, 90 Geo. L.J. 607, 638 (2002) (noting the personal as well as structural components of Schor’s otherwise "forgiving balancing test”).

. The Supreme Court’s non-delegation doctrine applied to the political branches parallels the Raddatz principle emphasizing retained and final determining authority. See Mistretta v. United States, 488 U.S. 361, 393-97, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (Congress may delegate the power to promulgate sentencing guidelines to an independent sentencing commission within the judicial branch, but Congress retains power to revoke or amend any or all of the guidelines).

. The majority limits its holding that Article III magistrate judges are in fact Article I enclave courts as they preside over petty offense trials of cases arising in federal land acquired pursuant to Clause 17, yet the majority refers to non-Clause 17 "federal enclaves” throughout its opinion. In support of its historical conclusion, the majority claims that Congress referred misdemeanor trial authority to the federal magistracy in numerous statutes from 1894 until 1948. The cited statutes pertain to non-Clause 17 federal land, mostly national parks. See Collins v. Yosemite Park & Curry Co., 304 U.S. 518, 529-30, 58 S.Ct. 1009, 82 L.Ed. 1502 (1938) (explaining that Clause 17 is “not the sole authority for the acquisition of jurisdiction” and noting that “[t]he United States has large bodies of public lands. These properties are used for forests, parks, ranges, wild life sanctuaries, flood control, and other purposes which are not covered by Clause 17.”). As the majority points out, the first commissioner position was authorized for Yellowstone National Park, which was under exclusive federal jurisdiction though not acquired pursuant to Clause 17. See Admin. Office of the U.S. Courts, A Guide to the Legislative History of the Federal Magistrate Judges System 2 (1995); Yellowstone Park Transp. Co. v. Gallatin Cnty., 31 F.2d 644, 645 (C.C.A.9 1929); Collins, 304 U.S. at 529-30, 58 S.Ct. 1009. It is also important to note that the Act of October 9, 1940 conferred trial jurisdiction, subject to the consent of the defendant, to United States commissioners over petty offenses that were committed "in any place over which the Congress has exclusive power to legislate or over which the United States has concurrent jurisdiction. ...” Act of October 9, 1940, ch. 785, 54 Stat. 1058. Again, this was not limited to Clause 17 federal enclaves, and this Act became the basis for the current magistrate judge system. See 28 U.S.C. § 636(a)(1) (giving U.S. magistrate judges “all powers and duties conferred or imposed upon United States commissioners”).
Adding another layer of incongruity, the statute under which Hollingsworth was convicted, 18 U.S.C. § 113, applies to "the special maritime and territorial jurisdiction of the United States,” which includes much more than Clause 17 federal property. See 18 U.S.C. § 7 (defining the "special maritime and territorial jurisdiction of the United States” as including, among other things: “[t]he high seas [and] any other waters within .the admiralty and maritime jurisdiction of the United States;” vessels, aircrafts, and space vehicles owned by the United States; "lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof;” and "[a]ny island, rock, or key containing deposits of guano”). The majority overlooks this further discrepancy in order to draw analogy with Palmore, in which the Court narrowed its holding to laws "applicable only within the District of Columbia.” Palmore, 411 U.S. at 410, 93 S.Ct. 1670.
The majority emphasizes that Hollingsworth was charged for a crime that is applicable in "federal enclaves,” but the term "federal enclave” can refer to a variety of federally owned land — land that is exclusively, partially, or concurrently under the jurisdiction of the federal government vis-á-vis the States. The jurisdictional status depends on which statute was in place when the land was acquired by the federal government or when the federal government accepted jurisdiction. Roger W. Haines, Jr., Federal Enclave Law 17 (2011). Already half a century ago, six million acres of land were under "exclusive” federal jurisdiction and thirty-six million were under either "partial” or "concurrent” feder *570 al jurisdiction. Id. at 56. These lands include military bases, national forests and parks, federal prisons, and public health facilities, among other property. Id. at 58-72. Also problematic for the majority’s position, within one federal property there can exist numerous jurisdictional statuses. For instance, the San Diego Naval Station consists of federally owned land that is under partial and exclusive federal jurisdiction as well as some federally owned land under state jurisdiction. Id. at 243, 275. Under the majority’s opinion, whether a defendant has a right to be tried by an Article III judge will depend on which of the neighboring piers he is standing on; or if the defendant is standing on the main public road through the Naval Station, which was retroceded to the State, Article III protections apparently would attach, in the middle of the enclave. See id. at 243-45.